# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

K.B. and M.B., by their mother,
Next Friend, and guardian T.B.,                    Case No.
P.S., by his guardian, M.S.,                       Hon.
G.P., by her parent and Next Friend A.P.,
D.P., by his guardian, T.P.,
G.G., by his mother and Next Friend M.G.,
J.W., by his guardian S.P.,

                                          **CLASS ACTION COMPLAINT**
                                          **JURY TRIAL REQUESTED**

      Plaintiffs,

v.

MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES; NICK LYON,
Director of Michigan Department of Health
and Human Services in his official capacity;
and RICHARD SNYDER, Governor of Michigan,
in his official capacity; jointly and severally,

      Defendants.

_____/

**MANTESE HONIGMAN, PC**
*Attorneys for Plaintiffs*
David M. Honigman (P33146)
dhonigman@manteselaw.com
Gerard V. Mantese (P34424)
gmantese@manteselaw.com
Theresamarie Mantese (P53275)
tmantese@manteselaw.com
Emily Fields (P82047)
efields@manteselaw.com
1361 E. Big Beaver Rd.
Troy, MI  48083
Telephone 248-457-9200
Facsimile 248-457-9201

| |
|---|
| There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed after having been assigned to a judge. |

**MICHIGAN PROTECTION
AND ADVOCACY SERVICE**
*Attorneys for Plaintiffs*
Chris E. Davis (P52159)
cdavis@mpas.org
Andrea L. Rizor (P78382)
arizor@mpas.org
4095 Legacy Parkway
Lansing, MI  48911
Telephone 517-487-1755

**JOHN J. CONWAY PC**
*Attorneys for Plaintiffs*
John J. Conway (P56659)
jj@jjconwaylaw.com
26622 Woodward Ave., Ste. 225
Royal Oak, MI  48067
Telephone 313-961-6525
_____/

## CLASS ACTION COMPLAINT AND JURY DEMAND

### I.    INTRODUCTORY STATEMENT

1.    This case concerns the Defendants' staggering failures to provide

needed mental health services to thousands of children and their families, which

Defendants have a legal duty to provide, causing tragic and incalculable damage to

human lives.

2.    Historically, children with intensive mental health care needs were

either treated in large institutional asylums or were left untreated and faced a future

of juvenile detention, adult incarceration, homelessness, and ever-declining

psychological, physical, and social conditions.   There is now widespread agreement among children's mental health experts that restrictive, institutional treatment centers pose unacceptable risks and can be a harmful environment for children.   By contrast, years of research and clinical experience have proven that intensive home and community-based mental health services are both successful and cost effective.   Such services are now relied upon as a necessary treatment modality, even for children with the most severe emotional and behavioral problems.   As a result, courts around the country have required that state Medicaid programs ensure the provision of an array of services under Medicaid's Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") requirements of Title XIX of the federal Social Security Act ("Medicaid Act").   Recognizing their legal obligation and the effectiveness of such services, several states have voluntarily reformed their systems to ensure that such services are made available to their Medicaid children and youth.

3.      By failing to create, provide, and support Medicaid services in children's homes and communities, and only offering minimal, if any, mental health services in restrictive institutional settings, the current system in Michigan is placing Plaintiffs and the members of the Plaintiff class at risk of (and in many cases ensuring) avoidable psychiatric hospitalizations or commitment to the juvenile delinquency system and permanent damage to their lives.

4.     The cost to taxpayers of failing to provide necessary treatment and services to children is well documented: inadequate care leads to a worsening of symptoms, with costlier consequences requiring more expensive responses.  The cost in lost opportunities to the children themselves—through higher school drop-out rates, involvement in the juvenile and criminal justice systems, and a very real prospect of a lifetime of cycling in and out of state psychiatric hospitals—cannot be calculated. These are the many families devastated by the Defendants' failure to comply with the law and provide critical services needed by those entitled to them.

5.     The harm to the named Plaintiffs and to the Plaintiff class is irreparable.  While the Defendants delay systemic reform, the childhood of each of the named Plaintiffs and Plaintiff class members is literally slipping away as they remain without medical treatment, or spend days, weeks, months, and years in institutions, detention centers, jail, and out-of-home placement far from their families, communities, and the assistance they require.  Injunctive and declaratory relief are necessary and appropriate because, absent relief ensuring that the Plaintiffs are provided necessary and legally required services, the named Plaintiffs and the class they represent will continue to suffer irreparable harm because of the Defendants' continued violations of their legal rights.

6.     This case concerns thousands of families who desperately need mental health services, such as Applied Behavioral Analysis ("ABA"), Community Living

Supports ("CLS") services, crisis stabilization services, and other intensive home and community-based services that the State of Michigan is required to offer.

7.     The families discussed below, who have filed this action as a class, are suffering irreparable injury daily because of the State of Michigan's wrongful failure to provide the medically necessary services these children require. These families are also representative of the numerous other Michigan families who have been denied access to medically necessary services by the State of Michigan, and who are representative of a class of citizens that require the protections provided under the United States Constitution and the Medicaid Act.

## II.     JURISDICTION AND VENUE

8.     This action is brought pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Social Security Act, 42 U.S.C. §§ 1396a(a)8; 1396a(a)(10).

9.     Jurisdiction is conferred on the Court by 28 U.S.C. §§ 1331, 1343.

10.     Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201, 2202; 29 U.S.C. § 794a; 42 U.S.C. § 1983; and 42 U.S.C. §12133.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendants are sued in their official capacity and perform their official duties by and through offices within the District and thus reside therein, and a

substantial part of the events and omissions giving rise to the claims herein occurred in this District.  Some of the named Plaintiffs reside in this District.

## III.   PARTIES

### A.   The Plaintiff Children:

### P.S. (Muskegon County)

12.   P.S. is a 20-year-old Medicaid beneficiary from Muskegon County, Michigan with significant mental health care needs. P.S. is nonverbal. For years, his mother desperately tried to obtain intensive home and community-based mental health services for P.S. The limited array of services made available to him and provided in his home and community were not enough to allow P.S. to remain safely at home. P.S. was cycled in and out of emergency room departments and eventually ended up institutionalized at a state psychiatric hospital.

13.   P.S. brings this action through his mother and legal guardian, M.S. He is a Medicaid recipient, for whom the Defendants have failed to arrange and provide the necessary intensive home and community-based services in Muskegon County, Michigan.

### D.P. (Isabella County)

14.   D.P. is an 18-year old Medicaid beneficiary from Isabella County, Michigan with significant mental health care needs. As soon as D.P. was eligible for Medicaid, his guardian applied for home and community-based services.

However, to date, D.P. has been unable to access the intensive services he needs. While D.P. continues to reside with his adoptive parents, he has been suspended from school, has attacked his parents and community members, and is now before the juvenile court for property destruction at school. D.P. desperately wishes to continue living at home, but without the intensive supports he needs, it may be determined it is not safe for him or the community.

15.    D.P. brings this action through his adopted father and legal guardian, T.P.  D.P. is a Medicaid recipient, for whom the Defendants have failed and continue to fail to arrange and provide for necessary intensive home and community-based services in Isabella County, Michigan.

### J.W. (Ingham County)

16.    J.W. is a 20-year old Medicaid beneficiary from Ingham County, Michigan with significant mental health care needs. J.W.'s mother applied for Medicaid's home and community-based services after J.W. was traumatized from being bullied at school. Although he was approved for services almost nine months ago, including ABA and psychiatric services, J.W. has yet to receive them. J.W. continues to isolate himself at home due to his anxiety and trauma.

17.    J.W. brings this action through his mother and legal guardian, S.P. He is a Medicaid recipient, for whom the Defendants have failed to arrange and

provide for necessary intensive home and community-based services in Ingham County, Michigan.

**G.P. (Iron County)**

18.   G.P. is a 12-year-old Medicaid beneficiary from Iron County, Michigan with significant mental health care needs. G.P. has been in and out of emergency room departments, has scars from forcing her arm through window panes, and has seriously injured her mother (resulting in hospitalization). G.P.'s mother has repeatedly pleaded for intensive home and community-based services, but has been either denied, advised the services do not exist, or offered minimal services based on lack of availability or resources in the county.  G.P. continues to be isolated at home. Her family lacks the intensive services needed to care for G.P. safely in the community and has been advised to consider placing her in the foster care system so that G.P. can get the services she needs.

19.   G.P. brings this action through her mother and legal guardian, A.P. G.P. is a Medicaid recipient, for whom the Defendants have failed to arrange and provide for necessary intensive home and community-based services in Iron County, Michigan.

**K.B. (Roscommon County)**

20.   K.B. is a 17-year-old Medicaid beneficiary from Roscommon County, Michigan with significant mental health care needs. For years his mother has

desperately tried to obtain intensive home and community-based mental health services for her son. K.B. has been cycling in and out of the emergency room for his behavioral conditions. He has been approved for ABA, CLS, and Respite, but has been waiting more than a year and a half to receive any of these services. His family has been told that K.B.'s challenging and aggressive behavior is the cause of the delay, but no supports are provided to him or the family as they struggle to survive.  His mother has been told to put K.B. in a facility or group home and that he will receive the ABA he needs there.

21.    K.B. brings this action through his mother, T.B.  He is a Medicaid recipient, for whom the Defendants have failed to arrange and provide for necessary intensive home and community-based services in Roscommon County, Michigan.

**M.B. (Roscommon County)**

22.    M.B. is an 18-year-old Medicaid beneficiary from Roscommon County, Michigan with significant mental health care needs. M.B. has been in and out of psychiatric hospitals, emergency room departments, and the juvenile justice system. M.B. has been diagnosed with autism and schizophrenia and has rarely, if ever, been provided with the intensive home and community-based services he required and still requires.

9

23.    M.B. brings this action through his mother and legal guardian, T.B. He is a Medicaid recipient, for whom the Defendants have failed to arrange and provide for necessary intensive home and community-based services in Roscommon County, Michigan.

### G.G. (Lapeer County)

24.    G.G. is a 14-year-old Medicaid beneficiary from Lapeer County, Michigan with significant mental health care needs. G.G. lives in a child caring institution ("CCI") during the week, which his school district pays for. Due to his significant behavioral needs, G.G. has been approved for services around the clock on the weekends at home. Despite this, for over nine months, he has not been provided with these authorized supports, necessary to keep him and his family safe at home.  Instead, it has been suggested to the family that they give up parental rights for G.G. so that he may receive the services he needs.

25.    G.G. brings this action through his parent, M.G. He is a Medicaid recipient, for whom the Defendants have failed to arrange and provide for necessary intensive home and community-based services in Lapeer County, Michigan.

**B.    The Defendants**

26.    Defendant Richard Snyder is the Governor of the State of Michigan. Under Article V, Section 8, of the Michigan Constitution, he is charged with

10

seeing that the laws of the State of Michigan are faithfully executed. He is responsible for seeking funds from the legislature to implement the Medicaid program. Defendant Snyder is also in charge of all departments of the Michigan government, including the Michigan Department of Health and Human Services ("MDHHS") and he appoints the MDHHS director.  Defendant Snyder is sued in his official capacity.

27.    Defendant Michigan Department of Health and Human Services ("MDHHS") is the agency designated as the single state agency responsible for administering and implementing Michigan's Medicaid program under 42 U.S.C. § 1396a(a)(5).

28.    Defendant Nick Lyon is the Director of MDHHS.

29.    As Director, Defendant Nick Lyon is responsible for ensuring Michigan's Medicaid program is administered and implemented consistent with the requirements of federal law.

30.    Defendant Nick Lyon is sued in his official capacity.

## IV.    CLASS ACTION ALLEGATIONS

31.    The Plaintiffs bring this action as a statewide class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of: All current or future Michigan Medicaid beneficiaries under the age of 21 with a behavioral, emotional, or psychiatric disorder who are or may be eligible for, but are not receiving, home

and community-based services, as further described herein, and as the class may be further clarified and defined throughout the course of this litigation.

32.     The Class is so numerous that joinder of all persons is impracticable. Upon information and belief, there are in excess of 32,000 individuals eligible to receive intensive home and community-based services through the Michigan Medicaid program, and hundreds, and likely thousands, of them are unable to receive the services that Defendants are required to provide.

33.     The Plaintiffs and Class Members have severe disabilities and limited financial resources. They are unlikely to institute individual actions.

33.     The claims of the Plaintiffs and Class Members raise common questions of law and fact. The factual questions common to the entire Class include whether the Defendants' system-wide policies, practices, and procedures have resulted in Medicaid beneficiaries under the age of 21 being unable to obtain the levels of Medicaid-covered, medically necessary, intensive home and community-based services which they have been approved for or are required to receive. The legal questions common to the Plaintiffs and all Class Members include: (a) Whether the Defendants have failed to "arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment for [intensive home and community-based services]" to the Plaintiffs and Class Members as mandated by the EPSDT provisions of the Medicaid Act

12

pursuant to 42 U.S.C. § 1396a(a)(43)(C) and 42 U.S.C. § 1396d(r)(5); (b) Whether the Defendants have failed to furnish medical assistance with reasonable promptness to the Plaintiffs and Class Members pursuant to 42 U.S.C. § 1396a(a)(8),(10); (c) Whether the Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to arrange for Medicaid-covered, medically necessary intensive home and community-based services thereby placing the Plaintiffs and the Class at risk of unnecessary institutionalization; (d) Whether the Defendants have violated Title II of the ADA or Section 504 of the Rehabilitation Act by failing to ensure that intensive home and community-based services are administered to the Plaintiffs and Class Members in the most integrated setting appropriate to their needs; (e) Whether the Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to make reasonable modifications to their programs and policies, which would result in the availability of intensive home and community-based services; and (f) Whether the Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by utilizing criteria or methods of administration that have the effect of subjecting the Plaintiffs and Class Members to discrimination on the basis of disability, or defeating or substantially impairing accomplishment of the objectives of the Defendants' program.

34.     The Plaintiffs' claims are typical of the Class Members' claims. None of the Plaintiffs and Class Members are receiving intensive home and community-based services at the level the Defendants found to be medically necessary or which are required to correct or ameliorate their conditions.

35.     The Plaintiffs are adequate representatives of the Class because they suffer from the same deprivations as the other Class Members and have been denied the same federal rights that they seek to enforce on behalf of the other Class Members.

36.     The Plaintiffs will fairly and adequately represent the interests of the absent Class Members.

37.     The Plaintiffs' interest in obtaining injunctive relief for the violations of their rights and privileges are consistent with and not antagonistic to those of any person within the Class.

38.     The Plaintiffs' counsel are qualified, experienced, and able to conduct the proposed litigation.

39.     Prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for the party opposing the Class or could be dispositive of the interests of the other members or substantially impair or impede the ability to protect their interests.

40.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy in that: (a) A multiplicity of suits with consequent burden on the courts and the Defendants should be avoided; and (b) It would be virtually impossible for all Class Members to intervene as parties-plaintiffs in this action.

41.     The Defendants have acted or refused to act, and continue to act or refuse to act, on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief with respect to the Class as a whole.

## V.     STATUTORY PROVISIONS

### A.     Brief Overview of the Medicaid Program in Michigan for Individuals with Developmental Disabilities and Serious Mental Illness.

42.     The Plaintiffs incorporate by reference paragraphs 1 through 41, as if fully set forth herein.

43.     The Medicaid program is jointly funded by the state and federal government under Title XIX of the Social Security Act. *See* 42 U.S.C. § 1396, *et seq.* States are reimbursed by the federal government for a portion of the cost of providing Medicaid benefits.

44.     The Medicaid program provides medical assistance for certain low-income children, families, pregnant women, individuals with disabilities, and the elderly.

45.    States are not required to participate in Medicaid, but once a state agrees to participate in Medicaid, it must comply with the requirements imposed by the Act.

46.    Michigan must operate and administer its Medicaid program in compliance with federal Medicaid statutes and regulations.

47.    States submit a plan for how the Medicaid program will be administered in accordance with federal law, called the State Plan. 42 U.S.C. § 1396a(a).

48.    Under federal law, that State Plan must contain and describe the nature and scope of the State's Medicaid program. 42 C.F.R. § 430.10.

49.    Federal law requires participating states to cover certain "mandatory" services. One mandatory service is Early and Periodic Screening, Diagnosis, and Treatment services ("EPSDT") for Medicaid-eligible children under the age of 21. 42 U.S.C. §§ 1396a(a)(10)(A); 1396a(a)(43); 1396a(a)(4)(B); and 1396d(r).

50.    Further, states must provide Medicaid benefits to all eligible individuals with reasonable promptness. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930(a).

51.    MDHHS has been designated as the single state Medicaid agency responsible for administering the Medicaid program in Michigan under 42 U.S.C. § 1396a(a)(5).

16

52.     MDHHS contracts the provision of services out to ten Prepaid Inpatient Health Plans ("PIHPs") throughout the state. 42 U.S.C. § 1396u-2(a)(1)(B).

53.     PIHPs are Medicaid Managed Care Organizations ("MCO") under M.C.L. § 400.109f. Under federal law, a Medicaid Managed Care Organization provides or arranges for services under 42 U.S.C. § 1396u-2(a)(1)(B).

54.     Prepaid inpatient health plans are established through a procurement process administered by MDHHS. Some Community Mental Health Service Programs ("CMHSP")[1] operate as PIHPs - including Wayne, Oakland, and Macomb. Others are made up of multiple CMHSPs, covering more than one county.

55.     Medicaid-covered specialty mental health services and supports for Medicaid beneficiaries with a serious mental illness, developmental disability, serious emotional disturbance, or substance abuse disorder are managed and delivered by those PIHPs. M.C.L. § 400.109f.

56.     Under M.C.L. § 400.109f, a PIHP "shall be responsible for providing defined inpatient services, outpatient hospital services, physician services, other specified Medicaid state plan services, and additional services approved by the

---

[1] CMHSPs are agencies established under the Michigan Mental Health Code to provide a comprehensive array of mental health services in their region (typically a county).

Centers for Medicare and Medicaid services under section 1915(b)(3) of title XIX of the Social Security Act, 42 U.S.C. § 1396n."

57.    All 10 PIHPs provide and arrange for Medicaid's intensive home and community-based services through the local Community Mental Health Service Program.

58.    MDHHS is required to have methods of keeping itself informed of local agency adherence to the State Plan and to take corrective action to ensure adherence. 42 C.F.R. § 435.903.

59.    The Medicaid agency may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, or regulations on program matters. 42 C.F.R. § 431.10.

60.    In other words, MDHHS is required to make the rules and regulations that it follows in administering the plan or that are binding upon local agencies that administer the plan. 42 C.F.R. § 431.10.

**B.    Section 1915 of the Social Security Act, EPSDT, and Reasonable Promptness.**

61.    Under federal law, the Defendants are mandated to provide Early and Periodic Screening, Diagnosis, and Treatment services to children under age 21 with reasonable promptness. 42 U.S.C. §§ 1396a(a)(10)(A); 1396a(a)(43); 1396d(a)(4)(B); 1396d(r); 1396a(a)(8); and 42 C.F.R. § 435.930(a).

62.    EPSDT services are defined under 42 U.S.C. § 1396d(r)(5) as:

18

[T]he term 'early and periodic screening, diagnostic, and treatment services' means the following items and services: . . . (5) Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) [42 USC 1396d(a)] of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

63.    The PIHP contract is required by law to specify all mandatory benefits.  The State must ensure that the PIHP has the capacity to offer the full range of necessary and appropriate preventive and primary services for all enrolled beneficiaries.  See 42 U.S.C. § 1396u-2.

64.    According to MDHHS' contracts, each PIHP must have network adequacy such that no Medicaid child is placed on a waiting list for services.

65.    While states may adopt managed care concepts and contract with entities to oversee the delivery of services, arrange services through provider networks, and deliver services, in doing so, the state remains responsible for ensuring compliance with all relevant Medicaid requirements, including the mandates of the EPSDT program.  42 U.S.C. § 1396u-2.

66.    Federal law requires MDDHS to have "methods and procedures" to assure that payments to providers are consistent with "efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the Plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C.

§ 1396a(a)(30)(A).

67.     Under EPSDT provisions, MDHHS must provide and make available all the services listed in 42 U.S.C. § 1396d(a) when needed to correct or ameliorate a psychiatric, behavioral, or emotional condition. 42 U.S.C. § 1396d(r)(5). Just a few of the services included under 42 U.S.C. § 1396d(a) are: home health care services (42 U.S.C. § 1396d(a)(7)), rehabilitative services (42 U.S.C. § 1396d(a)(13)), community supported living arrangements (42 U.S.C. § 1396a(a)(23)), services in intermediate care facilities (42 U.S.C. § 1396a(a)(15)), and inpatient psychiatric hospitalization (42 U.S.C. § 1396a(a)(16)).

68.     Michigan's Medicaid Provider Manual requires:

> Medically necessary services include habilitative or rehabilitative services that are expected to attain, maintain, or regain functional capacity and to achieve maximum health and function.  A service need not cure a condition in order to be covered under EPSDT, and maintenance services or services that improve the child's current health condition are also covered in EPSDT because they ameliorate a condition.  The common definition of ameliorate is "to make more tolerable."  Thus, services such as physical and occupational therapy are covered when they have an ameliorative, maintenance purpose. Maintenance services are defined as services that sustain or support rather than those that cure or improve health problems.

Michigan Medicaid Provider Manual, EPSDT Chapter, Page 1.

69.     Centers for Medicaid and Medicare Services' guidance similarly states:

> A service need not cure a condition in order to be covered under EPSDT. Services that maintain or improve the child's current health

condition are also covered in EPSDT because they "ameliorate" a condition. Maintenance services are defined as services that sustain or support rather than those that cure or improve health problems. Services are covered when they prevent a condition from worsening or prevent development of additional health problems. The common definition of "ameliorate" is to "make more tolerable.[2]

70.    EPSDT services include all forms and types of behavioral and mental health Medicaid services which are medically necessary for children.

71.    MDHHS has mandated that each PIHP must make EPSDT services available to children where medically necessary. These include, among many others, intensive crisis stabilization, Applied Behavior Analysis ("ABA"), Community Living Supports ("CLS"), respite, crisis residential, psychiatric hospitalization, partial hospitalization, therapeutic foster care, targeted case management, supports coordination, home based services, and wrap around.

**C.    The Americans with Disabilities Act (ADA).**

72.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

---

[2] U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services, *EPSDT - A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents* (June 2014) at page 10. https://www.medicaid.gov/medicaid/benefits/downloads/epsdt_coverage_guide.pdf (last visited June 5, 2018).

73.    Title II's implementing regulations require, under 28 C.F.R. § 35.130(d), that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

74.    In passing the ADA, Congress recognized:

[I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities; and

[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]

42 U.S.C. § 12101(a)(4), (a)(7).

75.    The U.S. Supreme Court has held that segregation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, and economic independence." *Olmstead v. LC ex rel Zimring*, 527 U.S. 581, 597-600 (1999).

76.    Unjustified institutionalization constitutes a form of discrimination based on disability prohibited by Title II. *Id.* at 596.

77.    According to the Department of Justice and several federal Courts of Appeals (including the 2nd, 4th, 7th, 9th, and 10th Circuits), a plaintiff makes out a valid *Olmstead* claim "if a public entity's failure to provide community services. . . will likely cause a decline in health, safety, or welfare that would lead to the individuals' eventual placement in an institution."  *Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016); U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disability Act and Olmstead v. L.C.*, *available at:* http://www.ada.gov/olmstead/q&a_olmstead.htm.

**D.    Section 504 of the Rehabilitation Act of 1973.**

78.    Like the ADA, Section 504 of the Rehabilitation Act prohibits discrimination of individuals with disabilities under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

79.    Its implementing regulations require entities receiving federal financial assistance to "administer programs and activities in the most integrated setting appropriate. . ." 28 C.F.R. § 41.51(d).

80.    The implementing regulations further prohibit the Defendants from directly, or through other arrangements, utilizing "criteria or methods of administration" that effectively subject individuals with disabilities to

discrimination based on their disability or that "substantially impair accomplishments of the objectives" of the program. 28 C.F.R. § 41.51.

### E.    Procedural Due Process.

81.    The right to procedural due process is secured by the 14th Amendment of the United States Constitution.  Individuals have a constitutionally-protected property interest in public benefits. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).

82.    Medicaid participants' hearing and notice rights under *Goldberg* are codified at 42 C.F.R. § 431.205(d): "The hearing system must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart."

83.    Under *Goldberg,* the state must provide "a meaningful notice stating the basis for the action and, when coverage is to be reduced or terminated, a pre-termination notice informing the claimant of the right to continue benefits pending a final administrative decision."

84.    The Medicaid Act requires that "[a] State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

85.     42 C.F.R. § 431.206 requires that a state provide notice of a beneficiary's right to a hearing and provide instructions on how to request it "[a]t the time of any action affecting his or her claim."

86.     Notice given under 42 C.F.R § 431.210 must "contain (a) A statement of what action the State … intends to take; (b) The reasons for the intended action; (c) The specific regulations that support, or the change in Federal or State law that requires, the action; (d) An explanation of— (1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or (2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and (e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested."

## VI.     ADDITIONAL FACTUAL BACKGROUND

87.     MDHHS is failing to ensure that Medicaid beneficiaries under the age of 21 with behavioral, emotional, or psychiatric disorders receive medically necessary services required by law.

88.     Over the past few years, MDHHS has convened several workgroups assessing access to specialty mental health services.

89.     One such workgroup was established and mandated by the Legislature, consisting of PIHP network providers, MDDHS, CMHSPs and others, to "analyze the workforce challenges of recruitment and retention of staff who

provide Medicaid-funded community living supports, personal care services, respite services, skill building services, and other similar supports and services." *Recruitment and Retention Challenges for the Workforce Delivering the Most Frequently Used Supports and Services* (September 30, 2016), available at: https://www.michigan.gov/documents/mdhhs/Section_1009-3_530703_7.pdf.

90.   This workgroup substantiated the difficulties Medicaid-funded agencies and beneficiaries have in attracting and retaining competent staff - resulting in "negative outcomes and consequences for beneficiaries, their employers, direct support staff, the system of supports and services, and the state of Michigan." *Id.*

91.   The workgroup concluded "the direct support workforce is woefully understaffed, rendering the Medicaid funded supports and services delivery system unstable. This instability has led to declines in access and quality of the supports and services delivered." *Id.*

92.   Dating back to 2016, and possibly much further, MDHHS knew it was not fulfilling the Medicaid mandates due to systemic problems with access to services as evidenced by the workgroup's recommendations below:

> After months of discussion and review of available data, the workgroup on the direct support workforce mandated by the Michigan Legislature has concluded that the critically important frontline workforce delivering face-to-face supports and services to the state's residents with intellectual and developmental disabilities, mental illness, or substance use disorders is not stable. Employers, including

individuals using self-determination as well as organizational employers are not able to recruit and retain a qualified, competent workforce. In order to fulfill the service and support requirements of both the state's Mental Health Code and the Medicaid program, additional state investments and new state policies and practices are needed to secure the dignity, well-being, and independence of people living with disabilities.

93.    Since this report was issued, the Defendants have done little to resolve the staffing crisis and lack of access to services experienced by the Plaintiffs and the Class Members. This is reflected in a recent MDHHS report (released February 2018), which again highlights the systemic problem regarding timely access to services.

94.    MDHHS convened a workgroup to evaluate access to psychiatric hospitalization services in Michigan. This workgroup reported "the crisis in access to inpatient psychiatric services has continued unabated."[3]

95.    To highlight the extent of the problem, the MDHHS' study cited in the report found:

> As the number of inpatient psychiatric beds has decreased, health care providers have increasingly struggled to secure inpatient services for individuals who are in psychiatric crisis. Providers must frequently contact multiple facilities with no guarantee that an appropriate bed may be available. MidState Health Network's (MSHN) recent study on inpatient psychiatric bed denials has provided empirical evidence of this trend. From March 2016 to March 2017, Community Mental Health Service Programs (CMHSPs) in the MSHN region reported

---

[3] *Final Workgroup Report Michigan Inpatient Psychiatric Admissions Discussion*, MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES (Feb. 13, 2018), https://www.michigan.gov/documents/mdhhs/MIPAD_WorkgroupReport_613570_7.pdf

31,107 instances of community-based psychiatric inpatient denials, which impacted 1,676 individuals: as a result, each individual on average was denied access to inpatient services over 18 times within one year. *Id.*

96.    MDHHS' report found that access is even more difficult for "individuals with complex needs, which includes (1) aggression, (2) intellectual and/or developmental disabilities (including Autism Spectrum Disorder), (3) substance use disorders, and (4) medical co-morbidities. Individuals with complex needs are also the most likely to be denied admission for inpatient psychiatric services." *Id.*

97.    As evidenced by its own study above, MDHHS knows there is a shortage of psychiatric hospitalization services and community-based services for children on Medicaid, causing these children to be unable to receive timely access to treatment as indicated below:

Most community hospitals are not designed to care for individuals who are violent, aggressive and/or intellectual or developmentally disabled as well as individuals who need long-term rehabilitative stays.

. . . Michigan's state-run psychiatric hospitals are operating at full capacity, and there is a 200-person waitlist on most days. In the absence of programs to care for individuals who need longer-term or complex care, many patients end up waiting in a hospital emergency room for placement in a state facility.

. . . Michigan has a shortage of children's psychiatric inpatient capacity, which is causing children and adolescents to be boarded in emergency departments and not receiving appropriate care in a timely

manner.   The emergency department is not a safe and therapeutic environment for a child in need of inpatient psychiatric care. . . .

*Id*.

98.    MDHHS is further aware that there is limited access to treatment for children as a result of shortages, resulting in children cycling in and out of hospitals and jails as evidenced by its statements in the report below:

> The sub-workgroup members also noted that there is a lack of continuity of care when the individual is discharged from one program or department to another resulting in the individual not receiving services in a timely fashion or receiving limited follow-up of services, which contributes to recidivism.
>
> The sub-workgroup members noted that (1) the limitations on mental health services at jails and jail diversion efforts and (2) ongoing barriers to accessing community-based services contribute to the increased demand for inpatient psychiatric services. The sub-workgroup members specifically highlighted that the shortage of crisis residential and after-care programs elevates the demand for inpatient psychiatric services.
>
> The sub-workgroup members also emphasized the role that staffing shortages and lack of specialized trainings for staff have across all service domains, which includes psychiatry, social work, nursing, behaviorists, and behavioral technicians.

*Id.* at 14.

99.    Other reviews conducted recently by MDHHS have uncovered and highlighted significant contract violations which have resulted in hundreds, if not thousands, of children not receiving authorized medically necessary services. MDHHS has not demonstrated any ability to enforce compliance among the PIHPs

with any real outcomes for those most in need.

100.  For example, recent sanction letters highlight the following problems but allow the PIHP six months to comply at sixty percent, all while children continue to wait for services:

A. In March 2018, MDHHS notified Oakland County's PIHP that it was out of compliance because 40% of children approved for ABA were not receiving it, even though deemed medically necessary. Another 50% of children were not receiving ABA in the amount, scope, and duration deemed medically necessary.

B. In May 2018, MDDHS notified Northern Michigan Regional Entity (a PIHP) that 74% of the children receiving ABA were not receiving it in the amount, scope, and duration as deemed medically necessary.

C. In May 2018, MDHHS notified the Lakeshore Regional Entity (a PIHP) that 47% of its children approved for ABA were not receiving the services deemed medically necessary. And of those receiving ABA, 70% were not receiving it in the amount, scope, and duration as deemed medically necessary.

101. In fact, MDDHS reported to the Michigan Legislature in February 2018 that "Medicaid has 68% (3,534) of youth eligible to receive ABA waiting for

appropriate services – 39% (2,027) youth are receiving less ABA services than approved – 29% (1,507) youth are waiting to start ABA services."[4]

102. Despite annual reporting data reflecting zero dollars spent on intensive crisis stabilization for years by most counties, it was not until problems of access to psychiatric hospitalization services arose that MDHHS took steps to enforce access to intensive stabilization services for children. For the past eight months PIHPs have been working on making these services available, but to this day they are still not being provided to children.  Defendants are wrongfully failing to provide services desperately needed and mandated by federal law.

103.  Intensive crisis stabilization services are not the only intensive home and community-based services many PIHPs refuse to make available to children. Most PIHPs do not make crisis residential, crisis respite, or therapeutic foster care available to children (particularly those with developmental disabilities) in times of crisis.

104. The children suffering from this disjointed and poorly regulated system cannot obtain the medically necessary treatment they require, resulting in, among other things, cycling in and out of the hospital, being boarded in emergency rooms, removed from home to receive treatment in segregated settings, becoming

---

[4] https://www.michigan.gov/documents/mdhhs/FINAL_--FY19_BHDDA_Budget_Presentation_2-21-2018_616315_7.pdf  (last visited 6/1/2018).

wards of the state, jailed, unable to receive a proper education, and physically and mentally injured because of improper treatment.

105. The following are examples of the difficulties class members have faced in obtaining services under this poorly regulated system.

**The Plaintiff Children**

**<u>P.S.</u>**

106. P.S. is a Medicaid beneficiary who has not received the home and community-based mental health services necessary to correct or ameliorate his mental health conditions or reduce his behavioral symptoms.

107. P.S. is a non-verbal, 20-year-old male diagnosed with Intermittent Explosive Disorder, Autism, intellectual disabilities, and Cerebral Palsy.

108. Because of his illnesses and disorders, P.S. displays intermittent and severe aggression, sudden outbursts of rage, inattention, agitation, food stealing, and sleep disruption.

109. Although P.S. had been served by the local Community Mental Health ("CMH") for many years, incredibly, he was only referred to CMH's autism program at age 17.

110. At that time, only minimal services were offered – ABA for only two hours a day, five days a week - even though CMH assessed him as a "severe community safety risk to others . . . "requir[ing] a specially controlled home

environment, direct supervision at home and/or direct supervision in the community."

111.  Despite his high risk, P.S. experienced catastrophic failures to receive mental health services and ruinous delays from 2015 to 2017.  P.S. experienced a delay of nearly a year in receiving occupational therapy ("OT") services, over a six-month delay in Community Living Support ("CLS") services, significant delays accessing specialized residential services, crisis residential, respite, and was unable to obtain psychiatric hospitalization services in Michigan.

112.  Without the intensive home and community-based services he needed in the community or in the institution, P.S.'s dysfunctional behavior continued to escalate, such as attempting to exit moving vehicles, running into traffic, and attacking his mother and other family members. According to the CMH record, "[his mother] feels the services are not helping protect her or P.S.  P.S. is still aggressive and causes harm to [his mother]. [His mother] is afraid that she will end up one-day dead."

113.  P.S. was placed in an adult foster care home ("AFC") in November 2016, where he began receiving 24/7 staff supports, versus the ten hours per week promised to him in the home.

114.  On July 1, 2017, the AFC home discharged P.S. with only 24 hours' notice because of his aggressive and challenging behaviors. Although he was

subsequently approved for psychiatric hospitalization, no hospital would accept him.

115.  On July 3, 2017, P.S. was admitted to Indiana's psychiatric hospital – the only hospital that would treat him. He was discharged and sent home on July 18, 2017, with no increase in in-home mental health supports through CMH.

116.  By August 28, 2017, P.S. had been to the emergency room four more times because of his dangerous behaviors. Despite this, CMH was still unable to timely provide specialized residential services or the intensive home and community-based services he required, leaving P.S. to cycle in and out of the hospital untreated.

117.  By January 2018, the cycle again repeated, with P.S. going in and out of the emergency room. P.S. was eventually admitted to the Kalamazoo Psychiatric Hospital in Michigan on January 16, 2018. Within weeks, he was physically assaulted and brutally stomped on by another patient.

118.  After that, P.S. was taken to Flat Rock AFC, a large facility in Lapeer County. Within a few weeks of his arrival, P.S. was assaulted by another patient resulting in a broken tooth and a gash on his face requiring stitches.

119.  P.S. has never received notice of his right to request a hearing to dispute the denials and delays in service that meet standards of due process.

120.  P.S. was able to leave the Flat Rock facility and has moved into a six-

bed group home closer to his family home. He still does not receive the mental health supports, including behavior psychology and treatment, monitoring and training, therapy, and comprehensive assessments, he so desperately requires to ensure he will not once again be exposed to the trauma of cycling in and out of hospitals and facilities.

**J.W.**

121. J.W. is a Medicaid beneficiary who is not receiving the home and community-based mental health services he continues to need to correct or ameliorate his mental health conditions or reduce his behavioral symptoms.

122. J.W. is a 20-year-old who has been diagnosed with Fragile X Syndrome, Autism, and intellectual disabilities.

123. J.W. lives with his mother, step-father, and two siblings. He has limited communication skills and at times exhibits self-injurious behaviors and physical aggression. Following a traumatic experience at school, and as J.W. became more combative at home, J.W.'s mother sought out mental health services from the local CMH to assist J.W. and the family.

124. Since September 11, 2017, J.W.'s mother has repeatedly requested ABA services to help calm J.W.'s behavior and anxiety, deal with the trauma, help him with transitioning, and help him get back into a full day at school.

125. Although CMH sent out a referral for initial testing for ABA services

on September 13, 2017, J.W. was not tested until November 13, 2017. According to the records, J.W. has been approved for ABA but has yet to receive services due to a waiting list.

126.  CMH records further indicate finding a provider willing to serve J.W. has been challenging due to J.W.'s aggressive behaviors and a general lack of providers in the area.

127.  Despite the documented authorizations, CMH has provided nothing more to J.W. than case management to coordinate services that it refuses to make available to him.

128.  Desperate, J.W.'s mother's requested behavior psychology to work on behavior modification for her son as he waits for ABA. These services were denied. She has been further told he will not receive ABA after he turns 21.

129.  J.W. is also in need of trauma therapy and medical clinic services (i.e., a psychiatrist to review J.W.'s psychiatric medications, write prescriptions, and make changes to improve their effectiveness). As of this filing, J.W. is still waiting for these services.  According to the CMH records, there is a six to eight month waiting list for medical clinic services. And according to CMH, it does not make individual therapy available to individuals with developmental disabilities, despite it being a State plan service.

130.  J.W. has never received notice of his right to request a hearing to

dispute the denials and delays in service that meet due process standards.

131.  Without necessary mental health services, J.W.'s symptoms have not improved, resulting in his isolation at home.  Because of defendants' failures to provide necessary mental health services, J.W., like the other individuals described herein, and like thousands of class members, is daily being damaged and robbed of the chance at having a healthier and more meaningful life.

### K.B and M.B.

132.  This family has two male children that need Medicaid mental health services: K.B., and M.B.

### K.B.

133.  K.B. is a 17-year-old Medicaid beneficiary diagnosed with Autism with limited verbal skills. K.B. requires constant supervision to ensure the safety of himself and others around him, as he sometimes exhibits aggressive or violent behaviors.

134.  K.B. is not receiving the home and community-based mental health services he continues to need to correct or ameliorate his mental health conditions or reduce his behavioral symptoms.

135. K.B.'s family sought services from Northern Lakes CMH in December 2016.

136. An individualized plan of service ("IPOS") meeting was held on

37

December 29, 2016.

137. On January 25, 2017, a second meeting was held. In this meeting, K.B.'s family voiced concerns regarding his severe meltdowns. The family also reported to CMH that they had to keep a tarp on the floor because of his toileting accidents. The family again requested ABA services, as well as psychiatric medication reviews to address medication issues and ongoing aggressive behavior.

138. CMH noted in the record the family was overwhelmed and that they had requested respite, CLS, and other community supports – but services still had not been made available to them.

139. CMH was made aware in February 2017 and March 2017 that K.B. was displaying disruptive and violent behavior in school and was exhibiting sexual exposure.

140. Still, CMH was not providing any home and community-based services other than supports coordination.

141. On May 8, 2017, K.B.'s family continued to plead for help, requesting psychiatric services, ABA, and other services due to behavior concerns and a recent school suspension. Still, CMH services were not provided.

142. By May 15, 2017, K.B.'s school transitioned him to "temporary" home-bound education, which provided two hours of education a week. K.B. remains in the home-bound education program to this day.

143. A few weeks later, in June 2017, K.B. was sent to the emergency room for aggressive behavior and property damage.

144. After five days in the emergency room, K.B. was discharged without having received psychiatric treatment. He was sent home without any discharge planning or arrangement of home and community-based services. Instead, when CMH met with K.B. the day after he was discharged home, the supports coordinator observed that K.B. was extremely agitated, upset, screaming, crying, biting himself, throwing things, kicking, and hitting. No services were added except for a psychiatric evaluation a day later.

145. Almost seven months after the request for ABA and a month after hospitalization, K.B. was finally evaluated and approved for ABA. To this date, K.B. is still not receiving ABA, or other approved services such as CLS and Respite. K.B.'s family was never informed that K.B. was entitled to or could receive crisis residential services, mobile crisis services, or other intensive home-based services.

146. K.B. continues after 16 months to receive virtually no service of substance, even though his family has made multiple requests for services and has been authorized for others.

147. K.B. has never received notice of his right to request a hearing to dispute the denials and delays in service that meet due process standards.

148.  K.B. is in desperate need of ABA, assessments, CLS supports, respite care for his family, targeted case management and other Medicaid services. Without the necessary mental health services K.B. requires, his condition has not improved. Because of his behavioral symptoms, he continues to have significant difficulties in school and is at serious risk of harm to himself, his family, including two younger siblings, and his community. K.B. is at great risk of being removed from his home due to these behaviors that place him at risk of institutionalization.

**M.B.**

149.  M.B. is an 18-year-old Medicaid beneficiary who has been diagnosed with Intermittent Explosive Disorder, Schizophrenia, and Autism.

150.  M.B. is not receiving the home and community-based mental health services he continues to need to correct or ameliorate his mental health conditions or reduce his behavioral symptoms.

151.  M.B. was diagnosed while hospitalized following an incident in which he threatened people with knives. Two months after he was diagnosed, M.B.'s family requested Medicaid services from Northern Lakes CMH.

152. A CMH clinician assessed M.B. on November 11, 2016, which revealed he was still hearing voices and had suicidal thoughts.

153.  Despite these revelations, CMH did not initiate services.

154. By December 5, 2016, M.B. was hospitalized for his psychiatric

condition. He remained in the hospital for two weeks and was discharged home without CMH's home and community-based supports.

155.  Treatment planning with CMH did not begin until December 21, 2016. At that time, M.B. and his family made it very clear they needed help and, among other things, requested family and individual therapy, respite, and CLS.

156.  CMH's failure to timely respond to these requests (and to offer intensive home-based services) resulted in M.B. being sent to the emergency room again on December 27, 2016.

157.  M.B. received another week of psychiatric hospitalization.

158.  On or around January 4, 2017, M.B. was discharged from the hospital. Again, he was sent home from the psychiatric hospital without CMH home and community-based services.

159.  Instead, M.B.'s CMH case manager warned him that the next time he acted out violently he would be arrested and not sent to the hospital. Less than one day after his discharge, M.B. began hitting his mother and acting out violently. CMH called 911 and M.B. was taken to jail.

160.  M.B. was last released from jail on January 25, 2017, again without CMH support services other than case management. He returned to the emergency room two days later.

161.  M.B. remained hospitalized at White Pine Psychiatric Hospital and

then was taken to Hawthorn Psychiatric Hospital.

162.  M.B.'s medical records reflect he was hospitalized "due to reports of having disturbing visual and auditory experiences around 11 PM almost nightly, while at home with his parents. He will also have violent outbursts, including attacking his mother and grandmother. He was reported to have been trying to burn his father with light cigarettes."

163.  Between December 2016 and February 10, 2017, M.B. had been to the emergency room seven times and spent two weeks in jail after experiencing auditory and visual hallucinations leading to assaultive behaviors on family. No intensive home and community-based services were provided, nor was he or his family informed of these services to which he was entitled.

164.  On April 12, 2017, after approximately two months at Hawthorn, M.B. was discharged home. His records reflect that he received individual therapy at Hawthorn with great success. However, M.B. was discharged without any change to his IPOS or any additional CMH services, except for one one-hour session with a psychiatrist.

165.  M.B.'s therapist at Hawthorn reported M.B. had engaged in individual therapy focusing on help seeking and safety. The therapist reported "there has been grief and loss pertaining to his biological father and dealing with the sense of loss."

166.  Continued requests for therapy, ABA, and vocational assistance

continue to go unanswered.

167. CMH repeatedly failed to provide intensive home-based services, individual therapy, family therapy, ABA, CLS services, and respite.

168. CMH failed to make crisis residential treatment available or known to the family, as well as intensive crisis stabilization services.

169. CMH's continued failure to provide medically necessary services resulted in numerous hospitalizations, failed discharges home, and jail time.

170. M.B. has never received notice of his right to request a hearing to dispute the denials and delays in service that meet the standards of due process.

171. M.B. is in desperate need of home and community-based services to which he is entitled and is at risk of re-institutionalization without it.

**D.P.**

172. D.P. is a 20-year-old Medicaid beneficiary who has been diagnosed with Intermittent Explosive Disorder, Anxiety, ADHD, and developmental disabilities (specifically, moderate cognitive impairment).

173. D.P. is not receiving the home and community-based mental health services he continues to need to correct or ameliorate his mental health conditions or reduce his behavioral symptoms.

174. D.P. is quite talkative, social, and requires a lot of attention and energy. D.P.'s mother describes him as sweet, thoughtful, polite, and funny. His

mother says that D.P. has enormous potential until he loses his temper, and after a behavioral outburst he is apologetic and remorseful.

175. He has aggressive behaviors and sometimes violent outbursts. D.P. has been hospitalized for mental health issues in the past.

176. D.P.'s parents applied for Medicaid services through the local CMH, including respite, in January 2018. (He had received Medicaid intensive home-based services through CMH when he was younger but was wrongfully terminated from the program when CMH changed their policy to only serve those with Medicaid.)

177. On January 18, 2018, CMH performed a psychosocial assessment of D.P. In the report, CMH noted that D.P. displayed aggressive behavior and targets his parents and authority figures at school. This report also noted that his parents were seeking any services D.P. would be eligible for that would benefit him, including respite.

178. At that time, D.P. tore up a classroom at a local high school where he knocked over all the desks and broke a window. The next day he punched his mother and father.

179. On January 23, 2018, D.P.'s family and CMH held a planning meeting. Minimal CLS services were approved and added to the plan of service. CMH has never denied the additional services requested. Rather, the services were

simply never provided. Adequate notice which meets due process standards was never provided to D.P. It took months for CMH to obtain a CLS provider.

180. On March 7, 2018, D.P. had a meltdown at school, during which he was physically aggressive, destroyed property, and displayed self-harming behavior. Police were called, and he was taken to the emergency room.

181. D.P.'s medical records noted D.P.'s assaultive behavior towards his parents, which included throwing and breaking things, and acting aggressively at school and home.

182. Although CMH approved psychiatric hospitalization for D.P., nine hospitals denied him admission and he remained in the emergency room for five days. Only one hospital – Harbor Oaks – agreed to accept him. D.P.'s parents declined to admit D.P. to Harbor Oaks because they were aware of media reports of abuse and neglect at that facility. D.P.'s parents took him home without having been told that another hospital would take him.

183. Despite his mother's request after discharge for intensive stabilization services, respite, increased CLS, and parent support services, D.P. did not receive any additional services upon discharge nor has he received any denials or due process notice since.

184. Although services were requested as early as January 18, 2018, D.P. has received no crisis services, no comprehensive assessments, and minimal

45

community-based services.

185.  D.P.'s parents are particularly worried that D.P. will be shot by police because he gets violent and is also African American.  They are also very worried he will end up in prison because of his condition.

186.  While D.P. receives minimal mental health services in the home, D.P.'s staffing ratio at school is 3:1. In other words, D.P. always has three aides assisting him at school due to his significant needs.

187.  CMH agreed to assist the family in locating a community living services provider, integrating D.P. into the community, and other associated services.

188.  D.P. has never received notice of his right to request a hearing to dispute the denials and delays in service that meet standards of due process.

189.  Without necessary mental health services, D.P.'s symptoms have not improved. As recently as two weeks ago, D.P. assaulted a staff member and his mother at school. His parents pleaded for help from CMH, asking for intensive home and community-based services and crisis stabilization, which have gone unanswered.

**G.G.**

190.  G.G. is a 14-year-old Medicaid beneficiary. He has been diagnosed with down syndrome, bipolar disorder, and is showing symptoms of schizophrenia.

46

191.  G.G. is not receiving the home and community-based mental health services he continues to need to correct or ameliorate his mental health conditions or reduce his behavioral symptoms.

192.  G.G.'s biological grandparents (herein referred to as mother and father) have adopted G.G., and he calls them "mom" and "dad." He is described as cuddly as a teddy bear until he has a "behavior."

193.  G.G. weighs approximately 300 pounds. During G.G.'s behaviors, he targets his mother, who is petite and six inches shorter than he is. G.G. will throw anything in sight during his tantrums.

194.  As the result of G.G.'s behaviors, his parents have had to replace all the windows in the home with plexiglass and remove their French doors, replacing them with steel ones. G.G.'s family is constantly patching drywall and replacing furniture where G.G. has thrown things.

195.  Throughout the week, G.G. resides in a facility called Lighthouse, which is about 45 minutes from his home. His residency is paid for by the public-school system that he attended before Lighthouse.

196.  Last year, G.G.'s family received written notice that CMH would no longer fund services in the residential facility (because of issues with funding, not because of medical improvement) over the summer break or on weekends. Last summer, which the public school did not cover, G.G. came home, but CMH had a

difficult time producing qualified staff and fulfilling the hours it deemed medically necessary. The staff, and eventually the CLS agency, quit, leaving him without services.

197.  By fall 2017, G.G. was back at Lighthouse and returned home on the weekends. CMH could not find a CLS provider willing to serve G.G. on the weekends, even though CMH approved G.G. for around the clock care.

198.  CMH refused to pay for the residential facility despite being unable to provide care for him in his home. Adamant that CMH will not cover services in the facility, CMH instead offered to place G.G. in Hawthorn, a state psychiatric hospital (despite there being a three-month waiting list).

199.  According to a behavior assessment dated January 18, 2018, G.G. has significant behavioral issues both at Lighthouse and at home. These include "severe temper tantrums, physical aggression (hitting, kicking, spitting, some biting, and throwing things at people), property destruction (throwing things, breaking things, knocking things over, tearing things down), and SIB [self injurious behavior] (biting himself and history of banging his head against hard surfaces)."

200.  For over nine months, CMH has refused to provide G.G. with services due to lack of CLS staff or a CLS agency willing to serve him.  As a result, G.G.'s parents have had to pay out of pocket to send him to Lighthouse during times of

48

crisis, or Lighthouse has taken a loss on his residence. In violation of the law, CMH has suggested the parents work out a payment plan with the facility.

201. CMH does not have intensive crisis mobilization services in the county, nor will they offer or provide crisis residential or therapeutic foster care to G.G., or CLS providers.

202. G.G. has not received notice of his right to request a hearing to dispute the many denials of repeated requests for specialized residential services and significant delays in service that meet standards of due process.

203. Without the necessary mental health services G.G. needs, his symptoms will not improve. Because of his behavioral symptoms, he continues to be a safety risk to himself, the community, and his family when left without the services deemed medically necessary. The danger he presents is well documented. It is unfathomable how CMH could justify its declaration that extensive mental health supports are required but refuses to provide those services in the home or in a facility.

**G.P**.

204.  G.P. is a 12-year-old Medicaid beneficiary diagnosed with Autism.

205.  G.P. is not receiving the home and community-based mental health services she continues to need to correct or ameliorate her mental health conditions or reduce her behavioral symptoms.

49

206. G.P. has been in and out of the emergency room, but unable to access psychiatric hospitalization due to multiple denials by private hospitals.

207. G.P. has been approved for ABA services, but CMH has had a difficult time finding staff willing to serve her.

208. G.P.'s mother has made several requests for partial hospitalization, child therapeutic foster care, intensive crisis stabilization services, and crisis residential, and respite providers, but these requests go unanswered.

209. G.P.'s mother has repeatedly asked for more intensive home-based services such as increased ABA and CLS, but is repeatedly denied, despite the insurmountable evidence of the need at home.

210. G.P. has put her own arms and whole body through glass windows and chicken wire fencing, punched holes in walls, and thrown a metal coffee mug at her mother's head – resulting in hospitalization.

211. The CMH record reflects that service provision to G.P. is based on staffing availability and has asked G.P.'s mother to be patient and utilize what can be offered to her.

212. This is all while G.P. displays unmanageable behavior at home and with the ABA professionals such as: pulling staff's hair, slapping staff in the face, hitting, punching, and kicking staff, breaking staff's eye glasses, and throwing staff's glasses, pictures, shoes, coffee mugs, and clothes across the room. G.P. also

threw a metal coffee mug across the room and hit a staff member in the face. She often pulls her own hair and engages in other self-injurious behavior.

213.  G.P.'s mother has requested intensive ABA services in a residential short-term setting such that G.P. could receive around the clock ABA.  CMH suggests that it can meet G.P.'s needs in the community, effectively denying her any meaningful ABA service.

214.  The care plan also recognized G.P.'s need for extensive psychiatric counseling and coordination and monitoring, which have not been provided.

215.  G.P. continues to be isolated at home because it is not safe for her in the community. She receives minimal educational services. Her family lacks the intensive services needed to care for G.P. safely at home and has been advised to consider placing her in the foster care system so that G.P. could get the services she needs and to keep her younger sibling safe.

216.  Because of her behavioral symptoms, G.P. continues to be a safety risk to herself, the community, and her family when left without the intensive services she desperately needs. The danger she presents to herself, her younger sibling, and those around her is well documented.

## VII.   FIRST CLAIM FOR RELIEF

**A.     Violation of the Federal Medicaid Early and Periodic Screening, Diagnostic and Treatment (EPSDT) Mandate.**

217.  The Plaintiffs re-allege and incorporate herein by reference each and

every allegation and paragraph set forth previously.

218.  In violation of the EPSDT provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), and 1396a(a)(43)(C), the Defendants, while acting under the color of law, have failed to provide the Plaintiffs and Class Members with intensive home and community-based mental health services necessary to correct or ameliorate their conditions.

219.  In violation of the EPSDT provisions of the Medicaid Act, the Defendants, while acting under the color of law, have failed to "arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment [intensive home and community-based mental health services]" to the Plaintiffs and Class Members pursuant to 42 U.S.C. § 1396a(a)(43)(C).

220.  The Defendants' violations have been repeated and knowing and entitle the Plaintiffs and Class Members to relief under 42 U.S.C. § 1983.

## VIII.  SECOND CLAIM FOR RELIEF

**A.   Violation of the Federal Medicaid Reasonable Promptness Requirement.**

221.  The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

222.  The Defendants are engaged in the repeated, ongoing failure to arrange for (directly or through referral to appropriate agencies, organizations, or

individuals) corrective treatment.

223. The Defendants have acted under color of law in failing to provide intensive home and community-based mental health services to the Plaintiffs with "reasonable promptness," in violation of 42 U.S.C. § 1396a(a)(8).

224. The Defendants' violations have been repeated and knowing and entitle the Plaintiffs to relief under 42 U.S.C. § 1983.

## IX.    THIRD CLAIM FOR RELIEF

**A.    Violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq*.**

225. The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

226. Title II of the ADA provides that no qualified person with a disability shall be subjected to discrimination by a public entity. 42 U.S.C. §§ 12131-32. It requires public entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *See* 28 C.F.R. § 35.130(d).

227. The Plaintiffs and Class Members are "qualified individuals with a disability" within the meaning of the ADA in that they have physical and/or mental impairments that substantially limit one or more major life activities, including their ability to live independently without support.

228. The Plaintiffs and Class Members are entitled by law to receive

Medicaid specialty mental health services, including by requiring services necessary to maintain them in their homes in the community.

229. The Defendants, who are responsible for administering Michigan's Medicaid program in accordance with state and federal law, are subject to Title II of the ADA. 42 U.S.C. §§ 12131(1)(A) and (B) (1990).

230. The Defendants are obligated under the ADA to administer MDHHS' programs in a manner that enables qualified individuals with disabilities to live in the most integrated setting appropriate to their needs. The Defendants' failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (intensive home and community-based mental health services) for qualified individuals with disabilities such as the Plaintiffs and Class Members has placed the Plaintiffs and the Class Members at risk of institutionalization in violation of the ADA's integration mandate.

231. The Defendants have discriminated against qualified individuals with disabilities such as the Plaintiffs and Class Members by failing to provide reasonable modifications to programs and services in order to arrange for intensive home and community-based medically necessary mental health services.

232. The Defendants have utilized criteria and methods of administration that subject the Plaintiffs, Class Members, and other qualified individuals with disabilities to discrimination on the basis of disability, including risk of

unnecessary institutionalization, in ways that include failing to take the necessary steps to arrange for medically necessary intensive home and community-based mental health services.

233. The Defendants' actions are in violation of Title II of the ADA. The Plaintiffs and Class Members are entitled to declaratory and injunctive relief, and reasonable attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. § 12133.

## X.    FOURTH CLAIM FOR RELIEF

### A.    Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*.

234. The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

235. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits public entities and recipients of federal funds from discriminating against any individual by reason of disability. Public and federally-funded entities must provide programs and activities "in the most integrated setting appropriate to the needs of the qualified individual with a disability." *See* 28 C.F.R. § 41.51(d).

236. Policies, practices, and procedures that have the effects of unjustifiably segregating persons with disabilities in institutions constitute prohibited discrimination under Section 504. The Plaintiffs and Class Members are "qualified individuals with a disability" under Section 504 of the Rehabilitation

Act of 1973 in that they have physical and/or mental impairments that substantially limit one or more major life activities, including their ability to live independently without support.

237. The Plaintiffs and Class Members meet the eligibility requirements for Michigan Medicaid services, including services necessary to maintain them in their homes in the community.

238. Defendant MDHHS is a recipient of federal funds and is therefore a government entity subject to Section 504. 29 U.S.C. § 794(b). Defendants' failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (intensive home and community-based mental health services) to the Plaintiffs and Class Members places them at risk of institutionalization in violation of Section 504's integration mandate.

239. The Defendants have utilized criteria and methods of administration that subject qualified individuals with disabilities such as the Plaintiffs and Class Members to discrimination on the basis of disability, including risk of unnecessary institutionalization, by the Defendants' failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (intensive home and community-based mental health services) to the Plaintiffs and Class Members.

240. The Defendants' actions violate Section 504.

## XI.   FIFTH CLAIM FOR RELIEF

**A.     Violation of the Due Process Provisions of the Federal Medicaid Act.**

241.  The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

242.  The Medicaid Act requires that participating states provide an opportunity for a fair hearing for any individual whose requests for Medicaid services have been denied or not provided with reasonable promptness.  42 U.S.C. § 1396a(a)(3).

243.  The Defendants have failed to establish and maintain customs, policies, and practices to provide Plaintiffs and members of the Plaintiff Class with adequate written notice of reductions, terminations, and denials of Medicaid funded intensive home and community-based mental health services and their rights to a pre-termination or reduction fair hearing, in violation of 42 U.S.C. § 1396a(a)(3), which is enforceable by the Plaintiffs pursuant to 42 U.S.C. § 1983.

## XII.   SIXTH CLAIM FOR RELIEF

**A.     Violation of the Due Process Provision of the Fourteenth Amendment of the United States Constitution.**

244.  The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

245.  The Due Process Clause of the United States Constitution established the right for the Plaintiffs and members of the Plaintiff Class to receive notice of

reductions, terminations, and denials of Medicaid funded services and their right to a fair hearing to challenge such actions prior to implementation. *See Goldberg v. Kelly*, 397 U.S. 254 (1970); 42 U.S.C. § 1396a(a)(3).

246. The Defendants have failed to establish and maintain customs, policies, and practices to provide the Plaintiffs and members of the Plaintiff class with adequate written notice of reductions, terminations, and denials of Medicaid funded intensive home and community-based mental health services and their rights to a pre-termination or reduction fair hearing, in violation of the Due Process clause of the Fourteenth Amendment of the Constitution, which is enforceable by the Plaintiffs pursuant to 42 U.S.C. § 1983.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court order the following relief and remedies on behalf of themselves and all others similarly situated:

A.      Certify a Class Action.

B.      Issue a declaratory judgment in favor of the Plaintiffs and the Class that the Defendants have failed to comply with the requirements of the Medicaid Act, Due Process, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and related law.

C.      Declare unlawful the Defendants' failure to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective

treatment (intensive home and community-based mental health services) to the Plaintiffs and Class Members.

D.    Issue preliminary and permanent injunctive relief enjoining the Defendants from subjecting the Plaintiffs and Class Members to practices that violate their rights under the Medicaid Act, Due Process, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and related law.

E.    Issue preliminary and permanent injunctive relief requiring the Defendants to arrange, directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment (intensive home and community-based mental health services) to the Plaintiffs and Class Members.

F.    Retain jurisdiction over the Defendants until such time as the Court is satisfied that the Defendants' unlawful policies, practices, and acts complained of herein cannot recur.

G.    Award the Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1988, 12133 and 12205; and any other applicable law or regulation; and 173.

H.    Grant such other and further relief as the Court deems to be just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b) and Local Rule 9.1, the Plaintiffs demand a

trial by jury on all issues so triable.

                                          **MANTESE HONIGMAN, P.C.**

                                          *Attorneys for Plaintiffs*
By: */s/ Dave Honigman*
David M. Honigman (P33146)
dhonigman@manteselaw.com
By: */s/Gerard V. Mantese*
Gerard V. Mantese (P34424)
gmantese@manteselaw.com
Theresamarie Mantese (P53275)
tmantese@manteselaw.com
Emily Fields (P82047)
efields@manteselaw.com
1361 E. Big Beaver Rd.
Troy, MI  48083
Telephone 248-457-9200

                                          **MICHIGAN PROTECTION
AND ADVOCACY SERVICE**
Chris E. Davis (P52159)
cdavis@mpas.org
Andrea L. Rizor (P78382)
arizor@mpas.org
4095 Legacy Parkway
Lansing, MI  48911
Telephone 517-487-1755

                                          **JOHN J. CONWAY PC**
*Attorneys for Plaintiffs*
John J. Conway (P56659)
jj@jjconwaylaw.com
26622 Woodward Ave., Ste. 225
Royal Oak, MI  48067
Telephone 313-961-6525

Dated:  June 6, 2018