# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

K.B. and M.B., by their mother,
Next Friend, and guardian T.B.,
P.S., by his guardian, M.S.,
G.P., by her parent and Next Friend A.P.,
D.P., by his guardian, T.P.,
G.G., by his mother and Next Friend M.G.,
J.W., by his guardian S.P.,

     Plaintiffs,

v.

**MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES; ROBERT
GORDON**, Director of Michigan Department of
Health and Human Services in his official capacity;
and **GRETCHEN WHITMER**, Governor of
Michigan, in her official capacity; jointly and
severally,

     Defendants.

No. 18-cv-11795-TLL-PTM

Hon. Thomas L. Ludington

Mag. Patricia T. Morris

**INTERIM AGREEMENT**

---

**MANTESE HONIGMAN, PC**
David M. Honigman (P33146)
Gerard V. Mantese (P34424)
Theresamarie Mantese (P53275)
Emily S. Fields (P82047)
Attorneys for Plaintiffs
1361 E. Big Beaver
Troy, MI 48083
(248) 457-9200
dhonigman@mateselaw.com
gmantese@manteselaw.com
tmantese@manteselaw.com
efields@manteselaw.com

**MICHIGAN PROTECTION & ADVOCACY
SERVICE, INC.**
Chris E. Davis (P52159)
Kyle M. Williams (P77227)
Mark Cody (P42695)
Attorneys for Plaintiffs
4095 Legacy Parkway, Suite 500
Lansing, MI 48911
(517) 487-1755
cdavis@mpas.org
kwilliams@mpas.org
mcody@mpas.org

**NATIONAL HEALTH LAW PROGRAM**
Attorneys for Plaintiffs
Abigail Coursolle (CA – 26646)
coursolle@healthloaw.org
Kimberly Lewis (CA – 144879)
lewis@healthlaw.org
3701 Wilshire Blvd., Suite 750
Los Angeles, CA 90010
(919) 968-6308

**JOHN J. CONWAY, PC**
John J. Conway (P56659)
Attorney for Plaintiffs
2622 Woodward Ave. Suite 225
Royal Oak, MI 48067
(313) 961-6525
jj@jjconwaylaw.com

Kristin M. Heyse (P64353)
Tracy E. Van den Bergh (P70066)
Attorneys for Defendants
Michigan Department of Attorney General
Health, Education & Family Services Division
P.O. Box 30758
Lansing, MI  48909
(517) 373-770
heysek@michigan.gov
vandenberght@michigan.gov

**INTERIM AGREEMENT**

## <u>TABLE OF CONTENTS</u>

I.      PURPOSE AND OBJECTIVES OF THIS AGREEMENT ..................................2

II.     BACKGROUND ...........................................................................................................2

III.    JURISDICTION AND AUTHORITY OF THE COURT ........................................3

IV.     EFFECT OF INTERIM AGREEMENT AND NEGOTIATION OF A
        SUBSEQUENT AGREEMENT ...................................................................................4

V.      GOALS ...........................................................................................................................5

VI.     COMMITMENTS...........................................................................................................7

        A.      K.B. Principles .................................................................................7

        1.      Child Centered and Family Driven ...........................................................7
        2.      Team-Based ....................................................................................................8
        3.      Natural Supports ....................................................................................... `8
        4.      Collaboration.................................................................................................8
        5.      Home and Community Based ......................................................................8
        6.      Culturally Relevant ......................................................................................8
        7.      Individualized ...............................................................................................8
        8.      Strengths-based .............................................................................................8
        9.      Outcome-based ..............................................................................................8
        10      Unconditional Care .....................................................................................9
        B.      K.B.Commitments ........................................................................................9

        1.      Package of Intensive Child and Adolescent Services (MICAS).................9
        2.      Beneficiary Information and Service Array...............................................9
        3.      Eligibility and Access to Behavioral Health..............................................9
        4.      Service Delivery..........................................................................................10
        5.      Data Collection ...........................................................................................10
        6.      Reporting and Monitoring of Implementation Plan.................................10

VII.    EXPECTED ACHIEVEMENTS................................................................................11

VIII.   SCOPE OF RELEASES AND WAIVERS ...............................................................13

IX.     ACCESS TO INFORMATION ..................................................................................13

X.      OTHER PROVISIONS ...............................................................................................13

## <u>APPENDICES</u>

Appendix A: Michigan Intensive Child and Adolescent Services (MICAS)

## I.   <u>PURPOSE AND OBJECTIVES OF THIS AGREEMENT</u>

1.      The purpose of this Interim Agreement is to establish a process for Plaintiffs and Defendants (the "Parties") to negotiate a settlement of the above-named lawsuit, to enable the State of Michigan to improve its delivery of behavioral health services and supports to EPSDT[1]-eligible children with mental or behavioral disorders, including children with a Developmental Disability, and to ensure that these EPSDT beneficiaries receive all of the "medically necessary" supports and services as described by federal law.  42  U.S.C. § 1396d(r)(5) and 42 U.S.C. §1396a(a).

2.      This Interim Agreement includes three components: goals, commitments, and achievements.  The goals are broad objectives shared by the Parties that shall guide and inform the Parties as they negotiate a Subsequent Agreement and implement the terms of the Interim Agreement. The goals are statements of shared principles and broad objectives and are not enforceable. The commitments are items that Defendants agree to accomplish or actions that Defendants agree to perform to implement the Agreement. During the pendency of this Interim Agreement, Defendants will substantially comply with each of the commitments. The achievements are objective measures that, when accomplished at the end of this Interim Agreement, indicate that Defendants are in substantial compliance with the terms of the Interim Agreement.

## II.   <u>BACKGROUND</u>

3.      Plaintiffs brought this lawsuit entitled *K.B.. et al. v. MDHHS et al.* (the "*K.B.* Litigation"), filed June 6, 2018, Case No., 18-cv-11795-TLL-PTM, as a class action seeking injunctive and declaratory relief against then Michigan Department of Health and Human Services (MDHHS), Director Nick Lyon, and Governor Snyder (herein referred to as "State Defendants").

---

[1] Early and Periodic Screening, Diagnostic, and Testing.

The lawsuit was subsequently assigned to the Hon. Thomas Ludington, District Court Judge, as Case No. 18-cv-11795-TLL-PTM.

4.      The State Defendants filed a motion to dismiss, which the Court granted in part and denied in part on February 7, 2019.

5.      In February 2019, the Parties began efforts to negotiate a settlement of this case. The Parties conducted seven settlement conferences between March 2019 and February 2020, achieving substantial progress. Due to the COVID-19 pandemic, settlement conferences were halted in March 2020 and reconvened in June 2020. The parties have conducted additional settlement conferences since June 2020, achieving continued progress towards reaching this Interim Agreement.

6.      Counsel for Plaintiffs and the putative class believe that the best interests of the class will be substantially advanced by this Interim Agreement.

7.      This Interim Agreement is not to be construed as an admission of liability or wrongdoing by State Defendants.  State Defendants assert that they have meritorious defenses in response to the allegations of Plaintiffs and the putative class.  State Defendants have entered into this Agreement solely for the purpose of laying a foundation for systemic reform and to avoid the expense and diversion of resources caused by continued or protracted litigation.

8.      In consideration of the covenants and undertakings set forth herein and intending to be legally bound thereby, it is stipulated and agreed by Plaintiffs and State Defendants that State Defendants will undertake the commitments herein during the term of this Interim Agreement.

### III.      JURISDICTION AND AUTHORITY OF THE COURT

9.      The United States District Court has jurisdiction over the claims against all State Defendants pursuant to 28 U.S.C. §§ 1331, 1343(a).  Venue is proper in the Eastern District of

Michigan pursuant to 28 U.S.C. § 1391(b).

10.     The Parties to this Interim Agreement acknowledge that this Interim Agreement is the first step in settlement of the claims set forth in *K.B. v. MDHHS, et al.*  The Parties acknowledge this Interim Agreement establishes commitments and achievements to which State Defendants agree to be bound during the term of the Agreement.  The Parties acknowledge that this Interim Agreement calls for the cessation of litigation activities in this case for the term of the Interim Agreement.  The Parties further acknowledge this Court will continue to have jurisdiction over the K.B. Litigation during that period.

## IV.   EFFECT OF INTERIM AGREEMENT AND NEGOTIATION OF A SUBSEQUENT AGREEMENT

11.     The Parties anticipate that State Defendants will accomplish the goals, commitments, and achievements contained within this Interim Agreement on or before December 31, 2020.  By mutual consent of the parties, this completion date may be extended for good cause, subject to approval of the Court.  Nothing in this Interim Agreement shall obligate either party to enter into a Subsequent Agreement.  If the completion date is not extended by mutual consent or a Subsequent Agreement is not entered into by December 31, 2020, the settlement negotiations will cease, and the Parties shall resume litigation activities.

12.     Upon the execution of this Interim Agreement, the Parties agree to use best efforts to negotiate a Subsequent Agreement to continue implementation of the reforms outlined herein.  Any Subsequent Agreement may include settlement of some or all of Plaintiffs' legal claims.

13.     To effectuate this Interim Agreement and to negotiate the terms of any Subsequent Agreement, the Parties will:

         a.     Meet and confer virtually to exchange information and establish a meeting

schedule, no less than bi-weekly to negotiate the terms of any subsequent agreement.  Meetings may be cancelled upon agreement of the Parties.

b.     Establish milestones for the completion of specific terms and components of any Subsequent Agreement and place those milestones in a timeline.

c.     Use their best efforts to adhere to the established negotiation schedule and timeline.

## V.  GOALS

14.    The goals of this Agreement are to:

a.     Identify the Michigan intensive home and community-based service array (hereinafter referred to as "Michigan Intensive Child and Adolescent Services" or "MICAS"[2] and described generally in Appendix A), the population to be served, procedures for determining eligibility, how EPSDT beneficiaries access those services and supports, and how to monitor the fulfillment of and enforce the State Defendants' obligation to provide these supports and services.

b.     Establish practices and procedures to promote improved collaboration and coordination by child-serving agencies[3] that deliver care to EPSDT-eligible children with mental or behavioral disorders, including children with

---

[2] State Defendants agree to this name for purposes of this Interim Agreement.  However, they reserve the right to change the name of the service array.

[3] Child serving agencies include Michigan schools, child welfare programs, jails and juvenile justice agencies, Medicaid, and Community Mental Health.  The Parties agree and understand some of these agencies are not under the control or supervision of State Defendants; however, it is the expectation of the Parties that good faith efforts at coordination between State Defendants and the child serving agency occur to ensure the obligations of this Interim Agreement are met and in accordance with Federal Medicaid regulations.

Developmental Disabilities, and therefore improve the effectiveness of services to, and the outcomes of, families and children. Improving collaboration among child-serving agencies will reduce fragmentation of services, avoid duplication and waste, and lower costs.

c.   Establish a consistent statewide screening, assessment, and referral procedure that will facilitate access to behavioral health services, regardless of entry point, for all EPSDT-eligible children with mental or behavioral disorders, including children with Developmental Disabilities.

- It is the expectation of the parties that an EPDST eligible child with mental or behavioral disorders, including children with Developmental Disabilities, will be appropriately screened and, if necessary, assessed regardless of which child-serving agency is the initial point of contact, after which the child will be referred to the appropriate agency for provision of medically necessary services.

d.   Provide the foundation for the statewide provision of behavioral health services consistent with the principles under this Interim Agreement and develop and maintain a comprehensive service array in order to provide class members with timely access to medically necessary services.

e.   Make systemic changes to ensure that the services and supports that are medically necessary to maximize the success and functioning of EPSDT-eligible children and adolescents with behavioral health disorders into

healthy and independent adults are timely provided and out-of-home placements are minimized.

f.      Identify and develop quality management tools and measures to monitor, provide, and improve quality of care, and to provide transparency and accountability to families, children, and providers, advocacy organizations, and other stakeholders with interest in the provision of behavioral health services.

g.      Identify and develop objective and measurable standards to determine whether the State is fulfilling its obligation to provide necessary supports and services to EPSDT beneficiaries.

h.      Identify and develop reforms that maximize the effectiveness and efficiency of state resources in accordance with the K.B. Commitments outlined below.

## VI.      COMMITMENTS

15.     State Defendants agree to the commitments described below, which will be guided by the following principles:

### A.      K.B. Principles

Defendants agree to operate a behavioral health system that delivers services to children and adolescents with behavioral health or intellectual or developmental disorders guided by the following Principles:

1.      **Child Centered and Family Driven**: Family and child voice, choice and preferences are intentionally elicited and prioritized during all phases of the process, including planning, delivery, transition, and evaluation of services. Services and interventions are family-driven and child-guided from the first contact with or about the family or child.

2.     **Team-based**: Services and supports are planned and delivered through a multi-agency, collaborative teaming approach. Team members are chosen by the family and connected to them through natural, community, and formal support and service relationships. The team works together to develop and implement a plan to address unmet needs and work toward the family's vision.

3.     **Natural Supports**: The team actively seeks out and encourages the full participation of team members drawn from family members' networks of relationships (e.g. friends, neighbors, community and faith-based organizations). The care plan reflects activities and interventions that draw on sources of natural support to promote recovery and resiliency. However, implementation of the plan is not dependent on the availability of natural supports.

4.     **Collaboration**: The system responds effectively to the behavioral health needs of multi-system involved children and their caregivers, including children in child welfare, juvenile justice, behavioral health and developmental disabilities, substance use, primary care, and education systems. Delay in service should not occur as a result of questioning who is the responsible payor.

5.     **Home and Community-based**: Children are first and foremost safely maintained in, or returned to, their homes or the most family-like setting. Services and supports take place in the most inclusive, most integrated, most responsive, most accessible, and least restrictive or most family-like setting possible.

6.     **Culturally Relevant**: Services are culturally relevant and respect the values, preferences, beliefs, culture, and identity of the child/adolescent, family, and community.

7.     **Individualized**: Services and supports are individualized and tailored to the unique strengths and needs of each child and family. They are altered to meet changing needs and goals.

8.     **Strengths-based**: Services and supports are planned and delivered in a manner that identifies, builds on, and enhances the capabilities, knowledge, skills, and assets of the child and family, the strengths of the community, and other team members.

9.     **Outcome-based**: Based on the family's needs and vision, the team develops goals and strategies, ties them to observable indicators of success, monitors progress in terms of these indicators, and revises the plan accordingly. Services and supports are persistent and flexible to overcome setbacks and achieve goals and outcomes. Safety, stability, and permanency are

priorities.

10. **Unconditional Care**: A child and family team's commitment to achieving its goals persists regardless of the child's behavior, placement setting, family's circumstances, or availability of services in the community. The team continues to work with the family toward their goals until the services are assessed to be no longer necessary or if the family indicates that it is no longer required.

**B.   K.B. Commitments**

**1.   Package of Intensive Child and Adolescent Services**

a.   Michigan Intensive Child and Adolescent Services (MICAS).

No later than December 31, 2020, State Defendants will develop an implementation plan detailing a comprehensive intensive service array/package (MICAS) that will be individualized to each child, generally in line with the Appendix A outline, and that will be available to children timely and in the amount, scope, and duration necessary to meet the individual needs of eligible children and their families.

- Eligibility for this package of services will be based on a statewide functional assessment and screening tool.

- Prior to developing this plan, State Defendants will analyze Medicaid claims data for all Medicaid children under 21, to determine the characteristics of children in Michigan and the scope of the need for the MICAS service array so that sufficient capacity for the benefit is promptly established and these services and supports are available timely to all children who need them.

**2.   Beneficiary Information and Service Array**

No later than December 31, 2020, State Defendants will develop an implementation plan detailing how they will better inform and educate class members, providers, and public child serving agencies about the availability of and eligibility for behavioral health services and the MICAS array.

**3.   Eligibility and Access to Behavioral Health**

No later than December 31, 2020, State Defendants will develop an implementation plan detailing how they will ensure that all Community Mental Health Service Programs (CMHSPs) use the same eligibility criteria for services and the same screening and assessments.

4.      **Service Delivery**

    a.      No later than December 31, 2020, State Defendants will develop an implementation plan for providing all class members timely access to services, including but not limited to the MICAS package.

    b.      No later than December 31, 2020, State Defendants will develop an implementation plan for improving quality and adequate provider capacity throughout the state. Adequate provider capacity consists of a sufficient number of quality providers with capacity and expertise to provide all medically necessary behavioral and mental health services to EPDST-eligible children, including those with Developmental Disabilities.

5.      **Data Collection**

    a.      No later than December 31, 2020, State Defendants will develop an implementation plan for collecting, tracking, analyzing, and using data to determine how well the system is performing (i.e., to determine if Defendants are properly serving Michigan children and that children are benefiting from healthy and improved outcomes).

    b.      No later than December 31, 2020, State Defendants will develop an implementation plan for making public user friendly data detailing, among other items, the characteristics of children  screened, assessed, and made eligible, the services children are receiving, how much of each service they are receiving, who is receiving these services (e.g. – child welfare involved children, juvenile justice involved youth, special education involved children, etc.), and the intensity (e.g., how many hours per month) of the services, the outcomes for children and families, average monthly cost per child, and average monthly service utilization per child.

6.      **Reporting and Monitoring of Implementation Plan**

    No later than December 31, 2020, State Defendants will develop an implementation plan for identifying, gathering, analyzing, and using available, reliable and relevant data from a variety of sources (not just the PIHPs and CMHs) to adequately monitor the system, using tracking and quality management tools to measure access to care, assess adequacy of service capacity, evaluate and continuously improve outcomes, and ensure quality throughout the state.  The implementation plan shall address access to the data, and shall assign responsibility to review and react to the data at the individual child service, agency and statewide levels to ensure adequate capacity and quality of services, establish and maintain accountability, and monitor required systemic improvements.

## VII.  <u>EXPECTED ACHIEVEMENTS</u>

16.     The Parties anticipate State Defendants will complete implementation of this Interim Agreement on or about December 31, 2020.  The expected achievements of this Interim Agreement are set forth below.

17.     State Defendants shall have an implementation plan (with milestones) detailing how they will provide a comprehensive intensive service array/package (MICAS) to children timely and in the amount, scope, and duration necessary to meet their needs.

18.     State Defendants shall have defined the MICAS array, including those services described in Appendix A.

19.     State Defendants shall have described the children that will be eligible for the MICAS array and determined which tools will be used to establish eligibility.

20.     State Defendants shall have defined how the array will be provided, billed, and accessed.

21.     State Defendants shall have described how they will educate, inform, and train providers regarding the MICAS.

22.     State Defendants shall have collected and analyzed Medicaid claims data to determine the need for the MICAS array and necessary funding to provide these services. Once there is a complete picture of existing and needed funding for behavioral and mental health services for EPSDT children, including children with Developmental Disabilities, across all children service agencies, the data can be utilized to determine the adequacy of the rates, need for additional funding options, and/or need for additional provider capacity or expertise in meeting the obligations to the EPDST eligible children.

23.     State Defendants shall have defined the expected utilization of MICAS based on an

analysis of the data above.

24.     State Defendants shall have determined how the children identified in the data above will be screened and linked to services with specific milestones.

25.     State Defendants shall have an implementation plan detailing how they will provide EPSDT beneficiaries timely access to necessary behavioral health services and supports, including but not limited to the MICAS package.

26.     State Defendants shall have an implementation plan detailing how they will ensure quality and adequate provider capacity throughout the state.

27.     State Defendants shall have developed a flexible Communication Plan detailing how they will conduct effective outreach to and education of the community, stakeholders, and families regarding all EPSDT benefits, including the MICAS array.

28.     State Defendants shall have developed cross-system protocols consistent with this Interim Agreement and determined how they will embed those protocols in Agreements/policies/MOUs with child-serving agencies.

29.     State Defendants shall have developed a plan to transition existing intensive services capacity to the MICAS array consistent with the K.B. Principles.

30.     State Defendants shall have identified quality management tools and measures to be used for reporting, providing, and improving quality of care, and for providing transparency and accountability as consistent with the above Commitments. State Defendants shall have established milestones for implementation.

31.     State Defendants shall have implementation plans for all Commitments.

## VIII.   SCOPE OF RELEASES AND WAIVERS

32.     Nothing in this Interim Agreement shall be deemed to limit the Court's powers of

contempt or any other power possessed by the Court.

33.     Nothing in this Interim Agreement shall be deemed to limit the ability of any individual Plaintiff or putative class member to pursue any administrative remedies during the pendency of this case, however, the expectation is that the parties are working towards global resolution of claims through the K.B. Litigation.

34.     Nothing in this Interim Agreement shall be deemed to limit the ability of MPAS to fulfill its federal mandates pursuant to the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, 42 U.S.C. § 10801, *et seq*., and the regulations promulgated thereto, 42 C.F.R. § 51 *et seq*., and the Developmental Disabilities Assistance and Bill of Rights (DD) Act, 42 U.S.C. §15041, *et seq*., and the regulations promulgated thereto, 45 C.F.R. § 1326 *et seq.*

## IX.  **ACCESS TO INFORMATION**

35.     Formal discovery will be stayed until December 31, 2020.  However, the informal exchange of information is encouraged. The Parties shall have an obligation of candor to each other and shall disclose information and produce documents requested by the other Parties that pertain to this Interim Agreement.

## X.     **OTHER PROVISIONS**

36.     This Interim Agreement contains all the terms and conditions agreed upon by the Parties. The Parties agree those materials contained in the appendices to this Interim Agreement, as they are referenced in the main body of the Interim Agreement, are  included and fully incorporated into this Interim Agreement as if fully set forth herein. No other understandings, oral or otherwise, regarding the subject matter of this Interim Agreement shall be deemed to exist or to bind any of the Parties hereto.

37.     This Interim Agreement may be amended by mutual agreement of the Parties and

approval of the Court.  In order to be binding, such amendments must be in writing, signed by persons authorized to bind each of the Parties, and approved by the Court. The Parties further agree to work in good faith to obtain Court approval of necessary amendments or modifications.

38.     This Interim Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which taken together shall constitute a single instrument. This Interim Agreement may be executed by signature via facsimile transmission or electronic mail which shall be deemed the same as an original signature.

FOR PLAINTIFFS:

By: /s/David Honigman              Dated: August 4, 2020
Mantese Honigman P.C.
Dave Honigman


By: /s/ Kyle Williams (w/ consent)     Dated: August 4, 2020
Michigan Protection & Advocacy Service, Inc.
Kyle Williams


By:/s/ Kimberly Lewis (w/consent)     Dated: August 4, 2020
National Health Law Program
Kimberly Lewis


By:/s/ John Conway (w/consent)      Dated:  August 4, 2020
John J. Conway PC
John Conway


COUNSEL FOR DEFENDANTS:

By: /s/ Kristin Heyse (w/consent)     Dated:  August 4, 2020
Assistant Attorney General
Kristin M. Heyse

By: /s/ Tracy Van den Bergh (w/consent)     Dated:  August 4, 2020
Assistant Attorney General
Tracy Van den Bergh

APPENDIX A

**Michigan Intensive Child and Adolescent Services (MICAS)**

1.      **Intensive Care Coordination**

Intensive Care Coordination (ICC) includes facilitating assessment, care planning, coordination of services, authorization of services, and monitoring of services and supports to address children's health conditions by a single, consistent care coordinator.

Intensive Care Coordination provides:

•        A single point of accountability for ensuring that medically necessary services are accessed, coordinated, and delivered in a strength-based, individualized, family-driven child-guided culturally and linguistically relevant manner;

•        Services and supports that are guided by the needs of the child;

•        Facilitation of a collaborative relationship among a child, his/her family and child-serving systems;

•        Support the parent/caregiver in meeting child's needs;

•        A care planning process ensures that a care coordinator organizes and matches care across providers and child serving systems to allow the child to be served in their home and community; and

•        Facilitated development of an individual's care planning team. Teaming is a process that brings together individuals selected by the child and family who are committed to them through informal, formal and community support and service relationships. ICC will facilitate cross-system involvement and a formal Child and Family Team ("CFT").

ICC service components consist of:

*Assessment:* The care planning team (CFT) completes a strength-based, needs driven, comprehensive assessment to organize and guide the development of a Care Plan and a risk management/safety plan. The assessment process determines the needs of the child for medical, educational, social, behavioral health, or other services. ICC may also include the planning and coordination of urgent needs before the comprehensive assessment is completed. Further assessments will be provided as medically necessary and in accordance with best practice protocols.

15

APPENDIX A

*Planning-Development of a Family Driven-child guided Person Centered Plan (PCP):* Using the information collected through an assessment, the care coordinator convenes and facilitates the CFT meetings and the CFT develops a child guided and family-driven PCP that specifies the goals and actions to address the medical, educational, social, mental health, and other services needed by the child and family. The care coordinator works directly with the child, the family and others significant to the child to identify strengths and needs of the child and family, and to develop a plan for meeting those needs and goals.

*Referral, monitoring and related activities:* The care coordinator:

- works directly with the child and family to implement elements of the PCP;

- prepares, monitors, and modifies the PCP in concert with the CFT; determines whether services are being provided in accordance with the PCP; whether services in the PCP are adequate; and whether there are changes in the needs or status of the child and, if so, adjusting the plan of care as necessary, in concert with the CFT; and

- will actively assist the child and family to obtain and monitor the delivery of available services, including medical, behavioral health, social, therapeutic, and other services.

*Transition:* The care coordinator:

- develops a transition plan with the CFT, and implements it when the child has achieved the goals of the PCP; and

- collaborates with the other service providers and agencies on behalf of the child and family.

*Settings:* ICC may be provided to children living and receiving services in the community, including foster care placements, as well as to children who are currently in a hospital, group home, or other congregate or institutional placement as part of discharge or transition planning.

2. **Intensive Home and Community-Based Services (IHBS)**

Intensive Home and Community-Based Services (IHBS) are individualized, strength-based interventions to correct or ameliorate behavioral health conditions that interfere with a child's functioning. Interventions help the child to build skills necessary for successful functioning in the home and community and improve the family's or caregiver's ability to help the child successfully function in the home

and community.

IHBS are delivered according to an ICP developed by the CFT. The CFT develops goals and objectives for all life domains in which the child's behavioral health condition produces impaired functioning, including family life, community life, education, vocation, and independent living, and identifies the specific interventions that will be implemented to meet those goals and objectives. The goals and objectives seek to maximize the child's ability to live and participate in the community and to function independently, including through building social, communication, behavioral, and basic living skills. Providers of IHBS should engage the child or other family members or caregivers in home and community activities where the child has an opportunity to work towards identified goals and objectives in a natural setting.

Phone contact and consultation may be provided as part of the service.

IHBS includes, but is not limited to:

- Educating the child's family about, and training the family in managing, the child's needs;

- In-home functional behavioral assessment, as needed;

- Behavior management, including developing and implementing a behavioral plan with positive behavioral supports, modeling for the child's family and others how to implement behavioral strategies, and in-home behavioral aids who assist in implementing the behavior plan, monitor its effectiveness, and report on the plan's effectiveness to clinical professionals;

- Therapeutic services delivered in the child's home including, but not limited to therapeutic interventions such as (a) individual and/or family therapy, and (b) evidence-based practices (e.g., Family Functional Therapy, Multi-Systemic Therapy, Trauma-Focused Cognitive Behavioral Therapy, etc.). These services:

  o   Improve self-care, including addressing behaviors and social skills deficits that interfere with daily living tasks and avoiding exploitation by others;

  o   Improve self-management of symptoms, including assisting with self-administration of medications;

  o   Improve social functioning, including addressing social skills deficits and anger management;

    o    Support the development and maintenance of social support networks and the use of community resources;

    o    Support employment objectives by identifying and addressing behaviors that interfere with seeking and maintaining a job;

    o    Support educational objectives, including identifying and addressing behaviors that interfere with succeeding in an academic program in the community; and

    o    Support independent living objectives, by identifying and addressing behaviors that interfere with seeking and maintaining housing and living independently.

Clinical services are provided by a clinician rather than a paraprofessional.

**3.    Mobile Crisis Intervention and Stabilization Services (MCIS)**

Mobile crisis services include crisis planning and prevention services, as well as face-to-face interventions that support the child in the community.

Services include:

- Crisis Planning that, based on the child's history and needs, (a) anticipates the types of crises that may occur, (b) identifies potential precipitants and creates a crisis plan to reduce or eliminate, and (c) establishes responsive strategies by caregivers and members of the child's team to minimize crisis and ensure safety;

- Assessment of (a) precipitants of crisis, (b) behaviors that are occurring, (c) child and family safety, (d) what kinds of resources are available to address immediate problems, and (e) what strengths of the child and family can be used to address crisis;

- Stabilization of functioning by reducing or eliminating immediate stressors and providing counseling to assist in de-escalating behaviors and interactions;

- Referral and coordination with (a) other services and supports necessary to continue stabilization or prevent future crises from reoccurring, and (b) any current providers and team members, including the care coordinator, therapists, family members, primary care practitioners, and school personnel; and

- Post-crisis follow-up services (stabilization services) provided periodically up to 14 days after initial crisis occurs to (a) ensure continued safety, (b) delivery of additional services identified as necessary to prevent future

crises, and (c) if placed out-of-home, coordinate services from out-of-home providers and CFT to facilitate plan for a rapid return home.

*Settings:* MCIS are typically provided at the location where the crisis occurs, including the home (biological, foster, relative, or adoptive) or any other setting where the child is naturally located, including schools, recreational settings, child care centers, and other community settings and as approved by the parent.

*Availability:* MCIS are available 24 hours a day, 7 days a week, 365 days a year.

*Providers:* MCIS are provided by a trained and experienced mobile crisis professional or team, preferably drawn from members of the CFT. MCIS providers may include paraprofessionals.