## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

**D.D.**, by his parent and Next Friend
**B.N.**; **G.P.**, by her parent and Next
Friend **A.P.**; **G.G.**, by his mother and
Next Friend **M.G.**; **M.M.**, by his parent
and Next Friend **C.C.**; **L.G.**, by her
parent and Next Friend **T.G.**; **S.W.**, by
his parent and Next Friend **C.W.**;     and
**K.M.**, by his parent and guardian **L.M.**,

     Plaintiffs,

v.

**MICHIGAN DEPARTMENT OF
HEALTH AND HUMAN
SERVICES**; **ELIZABETH HERTEL**,
Director of Michigan Department of
Health and Human Services, in her
official capacity,

     Defendants.

No. 18-cv-11795-TLL-PTM
Hon. Thomas L. Ludington
Mag. Patricia T. Morris

---

**MANTESE HONIGMAN, PC**
David M. Honigman (P33146)
Gerard V. Mantese (P34424)
Theresamarie Mantese (P53275)
Attorneys for Plaintiffs
1361 E. Big Beaver
Troy, MI 48083
(248) 457-9200
dhonigman@mateselaw.com
gmantese@manteselaw.com
tmantese@manteselaw.com

**DISABILITY RIGHTS MICHIGAN**
Kyle M. Williams (P77227)
Nicholas A. Gable (P79069)
Attorneys for Plaintiffs
4095 Legacy Parkway
Lansing, MI 48911
(517) 487-1755
kwilliams@drmich.org
ngable@drmich.org

**NATIONAL HEALTH LAW PROGRAM**
Kimberly Lewis (CA – 144879)
lewis@healthlaw.org
Attorney for Plaintiffs
3701 Wilshire Blvd., Ste. 750
Los Angeles, CA 90010
(919) 968-6308

**JOHN J. CONWAY PC**
John J. Conway (P56659)
Attorney for Plaintiffs 2622
Woodward Ave. Ste. 225
Royal Oak, MI 48067
(313) 961-6525
jj@jjconwaylaw.com

Stephanie M. Service (P73305)
Kathleen A. Halloran (P76453)
Mark Donnelly (P39281)
**MICHIGAN DEPARTMENT OF ATTORNEY GENERAL**
Attorneys for Defendants
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 335-8703
ServiceS3@michigan.gov
HalloranK1@michigan.gov
Donnellym@michigan.gov

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

### I.   INTRODUCTORY STATEMENT

1.     This case concerns the Defendants' failures to provide needed mental health services to tens of thousands of children and their families, which Defendants have a legal duty to provide, causing tragic and incalculable damage to human lives.

2.      Historically, children with intensive mental health care needs were either treated in large institutions or were left untreated and faced a future of juvenile detention, adult incarceration, homelessness, and ever-declining psychological, physical, and social conditions. There is now widespread agreement among children's mental health experts that restrictive, institutional treatment centers pose unacceptable risks and can be a harmful environment for children. By contrast, years of research and clinical experience have proven that intensive home and community-based mental health services are both successful and cost effective. Such services are now relied upon as a necessary treatment modality, even for children with the most severe emotional and behavioral problems. As a result, courts around the country have required that state Medicaid programs ensure the provision of an array of services under Medicaid's Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") requirements of Title XIX of the federal Social Security Act ("Medicaid Act"). Recognizing their legal obligation and the effectiveness of such services, several states have voluntarily reformed their systems to ensure that such services are made available to their Medicaid children and youth.

3.      By failing to create, provide, and support Medicaid services in children's homes and communities, and only offering minimal, if any, mental health services in restrictive institutional settings, the current system in Michigan is

3

placing Plaintiffs and the members of the Plaintiff class at risk of (and in many cases ensuring) avoidable psychiatric hospitalizations or commitment to the juvenile delinquency system and permanent damage to their lives.

4.     The cost of failing to provide necessary treatment and services to children is well documented: inadequate care leads to a worsening of symptoms, with costlier consequences requiring more expensive responses. The cost in lost opportunities to the children themselves—through higher school drop-out rates, involvement in the juvenile and criminal justice systems, and a very real prospect of a lifetime of cycling in and out of state psychiatric hospitals—cannot be calculated. These are the many families devastated by the Defendants' failure to comply with the law and provide critical services needed by those entitled to them.

5.     The harm to the named Plaintiffs and to the Plaintiff class is irreparable. The Defendants' failure to ensure the provision of necessary behavioral health services substantially harms each of the named Plaintiffs and Plaintiff class members as they remain without services, or spend days, weeks, months, and in some cases years, in institutions, detention centers, jail, and out-of-home placement far from their families and communities. Injunctive and declaratory relief are necessary and appropriate because, absent relief ensuring that the Plaintiffs are provided necessary and legally required services, the named

Plaintiffs and the class they represent will continue to suffer irreparable harm because of the Defendants' continued violations of their legal rights.

6.     This case concerns thousands of families who desperately need behavioral health services, such as Community Living Supports ("CLS") services,[1] crisis intervention services, and other intensive home and community-based services that the State of Michigan is required to offer.

7.     The families discussed below, who have filed this action as a class, are suffering irreparable injury daily because of the State of Michigan's wrongful failure to provide the medically necessary services these children require. These families are also representative of the numerous other Michigan families who have been denied access to medically necessary services by the State of Michigan, and who are representative of a class of citizens who require the protections provided under the United States Constitution and the Medicaid Act.

## II.     JURISDICTION AND VENUE

8.     This action is brought pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*; Section 504 of the

---

[1] CLS services "are used to increase or maintain personal self-sufficiency, facilitating an individual's achievement of his goals of community inclusion and participation, independence or productivity. The supports may be provided in the participant's residence or in community settings." Michigan Medicaid Provider Manual, *Behavioral Health and Intellectual and Developmental Disability Supports and Services*, Section 17.3.B. Coverage includes assisting, prompting, reminding, cueing, observing, guiding, and/or training in the following activities: laundry, meal preparation, household care and maintenance, activities of daily living (such as bathing, toileting, etc.), and shopping for food and other necessities of daily living. *Id.* Coverage also includes, *e.g.*, assistance with socialization and relationship building, transportation to/from and participation in community activities, and assistance "with preserving the health and safety of the individual in order that he/she may reside or be supported in the most integrated, independent community setting." *Id.*

Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Social Security Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(r)(5), and 1396a(a)(43)(C).

9.    Jurisdiction is conferred on the Court by 28 U.S.C. §§ 1331, 1343.

10.    Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201, 2202; 29 U.S.C. § 794a; 42 U.S.C. § 1983; and 42 U.S.C. §12133.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendants are sued in their official capacity and perform their official duties by and through offices within the District and thus reside therein, and a substantial part of the events and omissions giving rise to the claims herein occurred in this District. Some of the named Plaintiffs reside in this District.

### III.    PARTIES

**A.    The Plaintiff Children**

12.    The Plaintiffs in this lawsuit consist of children with emotional, behavioral, or psychiatric conditions who require intensive home-and-community based behavioral health services.

13.    Each Plaintiff is a Medicaid beneficiary who resides in Michigan or intends to reside in Michigan if appropriate home and community-based support is made available to them.

14. The Plaintiffs are all children with disabilities who reside in institutional settings, have resided there in the past, or are at serious risk of institutional

6

placement unless they receive an array of intensive home and community-based services.

15. Plaintiffs bring this action through their parents or legal guardians or representatives. Each Plaintiff is a Medicaid recipient for whom the Defendants have failed to arrange and provide the intensive home and community-based services in Michigan needed to correct or ameliorate their emotional, behavioral, or psychiatric condition.

## B.    The Defendants

16. Defendant Michigan Department of Health and Human Services ("MDHHS") is the agency designated as the single state agency responsible for administering and implementing Michigan's Medicaid program under 42 U.S.C. § 1396a(a)(5).

17. Defendant Elizabeth Hertel is the Director of MDHHS.

18. As Director, Defendant Hertel is responsible for ensuring that Michigan's Medicaid program is administered and implemented consistent with the requirements of federal law.

19. Defendant Hertel is sued in her official capacity.

## IV.    CLASS ACTION ALLEGATIONS

20. The Plaintiffs bring this action as a statewide class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of: All Medicaid-eligible beneficiaries

under the age of 21 in the State of Michigan for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has determined, through an assessment, that intensive home-and-community based services are needed to correct or ameliorate their emotional, behavioral, or psychiatric condition.

21. The Class is so numerous that joinder of all persons is impracticable. Upon information and belief, there are more than 60,000[2] individuals potentially eligible to receive intensive home and community-based services through the Michigan Medicaid program, who are unable to receive the services that Defendants are required to provide.

22. The Plaintiffs and Class Members have severe disabilities and limited financial resources. They are unlikely to institute individual actions.

23. The claims of the Plaintiffs and Class Members raise common questions of law and fact. The factual questions common to the entire Class include whether the Defendants' system-wide policies, practices, and procedures have resulted in Medicaid beneficiaries under the age of 21 being unable to obtain Medicaid-covered, medically necessary, intensive home and community-based services. The legal questions common to the Plaintiffs and all Class Members include: (a)

---

[2] Michigan Department of Health and Human Services, *Report on CMHSPs, PIHPs and Regional Entities, Per Section 904(1) of PA 67 of 2019*, https://www.michigan.gov/documents/mdhhs/Section_904-1_715330_7.pdf (Last Visited February 3, 2022).

Whether the Defendants have failed to "arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment for [intensive home and community-based services]" to the Plaintiffs and Class Members as mandated by the EPSDT provisions of the Medicaid Act pursuant to 42 U.S.C. § 1396a(a)(43)(C) and 42 U.S.C. § 1396d(r)(5); (b) Whether the Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to arrange for Medicaid-covered, medically necessary intensive home and community-based services, thereby placing the Plaintiffs and the Class at risk of unnecessary institutionalization; (c) Whether the Defendants have violated Title II of the ADA or Section 504 of the Rehabilitation Act by failing to ensure that intensive home and community-based services are administered to the Plaintiffs and Class Members in the most integrated setting appropriate to their needs; (d) Whether the Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to make reasonable modifications to their programs and policies, which would result in the availability of intensive home and community-based services; and (e) Whether the Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by utilizing criteria or methods of administration that have the effect of subjecting the Plaintiffs and Class Members to discrimination on the basis of disability, or defeating or substantially impairing accomplishment of the objectives of the Defendants' program.

9

24.  The Plaintiffs' claims are typical of the Class Members' claims. None of the Plaintiffs and Class Members is receiving the intensive home and community-based services which are medically necessary and are required to correct or ameliorate their emotional, behavioral, or psychiatric conditions.

25. The Plaintiffs are adequate representatives of the Class because they suffer from the same deprivations as the other Class Members and have been denied the same federal rights that they seek to enforce on behalf of the other Class Members.

26. The Plaintiffs will fairly and adequately represent the interests of the absent Class Members.

27. The Plaintiffs' interest in obtaining injunctive relief for the violations of their rights and privileges is consistent with and not antagonistic to that of any person within the Class.

28. The Plaintiffs' counsel are qualified, experienced, and able to conduct the proposed litigation.

29. Prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for the party opposing the Class or could be dispositive of the interests of the other members or substantially impair or impede the ability to protect their interests.

30. A class action is superior to other available methods for the fair and efficient adjudication of the controversy in that: (a) A multiplicity of suits with consequent burden on the courts and the Defendants should be avoided; and (b) It would be virtually impossible for all Class Members to intervene as parties-plaintiffs in this action.

31. The Defendants have acted or refused to act, and continue to act or refuse to act, on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief with respect to the Class as a whole.

## V.   STATUTORY PROVISIONS

A.   **Brief Overview of the Medicaid Program in Michigan for Individuals with Developmental Disabilities and Serious Mental Illness.**

32. The Plaintiffs incorporate by reference paragraphs 1 through 31, as if fully set forth herein.

33. The Medicaid program is jointly funded by the state and federal government under Title XIX of the Social Security Act. *See* 42 U.S.C. § 1396, *et seq.* States are reimbursed by the federal government for a portion of the cost of providing Medicaid benefits.

34. The Medicaid program provides medical assistance for certain low-income children, families, pregnant women, individuals with disabilities, and the elderly.

35. States are not required to participate in Medicaid, but once a state agrees to participate in Medicaid, it must comply with the requirements imposed by the Act.

36. Michigan must operate and administer its Medicaid program in compliance with federal Medicaid statutes and regulations.

37. States submit a plan for how the Medicaid program will be administered in accordance with federal law, called the State Plan. 42 U.S.C. § 1396a(a).

38. Under federal law, that State Plan must contain and describe the nature and scope of the State's Medicaid program. 42 C.F.R. § 430.10.

39. Federal law requires participating states to cover certain "mandatory" services. One mandatory service is Early and Periodic Screening, Diagnosis, and Treatment services ("EPSDT") for Medicaid-eligible children under the age of 21. 42 U.S.C. §§ 1396a(a)(10)(A); 1396a(a)(43); 1396a(a)(4)(B); and 1396d(r).

40. Further, states must provide Medicaid benefits to all eligible individuals with reasonable promptness. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930(a).

41. MDHHS has been designated as the single state Medicaid agency responsible for administering the Medicaid program in Michigan under 42 U.S.C. § 1396a(a)(5).

42. MDHHS contracts the provision of services out to ten Prepaid Inpatient Health Plans ("PIHPs") throughout the state. 42 U.S.C. § 1396u-2(a)(1)(B).

12

43. PIHPs are Medicaid Managed Care Organizations ("MCO") under M.C.L. § 400.109f. Under federal law, a Medicaid Managed Care Organization provides or arranges for services under 42 U.S.C. § 1396u-2(a)(1)(B).

44. Prepaid inpatient health plans are established through a procurement process administered by MDHHS. Some Community Mental Health Service Providers ("CMHSP")[3] operate as PIHPs, including Wayne, Oakland, and Macomb. Others are made up of multiple CMHSPs and cover more than one county.

45. Medicaid-covered specialty mental health services and supports for Medicaid beneficiaries with a serious mental illness, developmental disability, serious emotional disturbance, or substance abuse disorder are managed and delivered by those PIHPs. M.C.L. § 400.109f.

46. Under M.C.L. § 400.109f, a PIHP "shall be responsible for providing defined inpatient services, outpatient hospital services, physician services, other specified Medicaid state plan services, and additional services approved by the Centers for Medicare and Medicaid services under section 1915(b)(3) of title XIX of the Social Security Act, 42 U.S.C. § 1396n."

_____

[3] CMHSPs are agencies established under the Michigan Mental Health Code to provide a comprehensive array of mental health services in their region (typically a county).

47. All 10 PIHPs provide and arrange for Medicaid's intensive home and community-based services through the local Community Mental Health Service Providers.

48. MDHHS is required to have methods of keeping itself informed of local agency adherence to the State Plan and to take corrective action to ensure adherence. 42 C.F.R. § 435.903.

49. The Medicaid agency may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, or regulations on program matters. 42 C.F.R. § 431.10.

50. In other words, MDHHS is required to make the rules and regulations that it follows in administering the plan or that are binding upon local agencies that administer the plan. 42 C.F.R. § 431.10.

**B.   Medicaid's EPSDT and Reasonable Promptness Requirements.**

51. Under federal law, the Defendants are mandated to provide Early and Periodic Screening, Diagnosis, and Treatment services to children under age 21 with reasonable promptness. 42 U.S.C. §§ 1396a(a)(10)(A); 1396a(a)(43); 1396d(a)(4)(B); 1396d(r); 1396a(a)(8); and 42 C.F.R. § 435.930(a).

52. EPSDT services are defined under 42 U.S.C. § 1396d(r)(5) as:

[T]he term 'early and periodic screening, diagnostic, and treatment services' means the following items and services: . . . (5) Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) [42 USC 1396d(a)] of this

section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

53. The PIHP contract is required by law to specify all mandatory benefits. The State must ensure that the PIHP has the capacity to offer the full range of necessary and appropriate preventive and primary services for all enrolled beneficiaries.  See 42 U.S.C. § 1396u-2.

54. According to MDHHS' contracts, each PIHP must have network adequacy such that no Medicaid child is placed on a waiting list for services.

55. While states may adopt managed care concepts and contract with entities to oversee the delivery of services, arrange services through provider networks, and deliver services, in doing so, the state remains responsible for ensuring compliance with all relevant Medicaid requirements, including the mandates of the EPSDT program. 42 U.S.C. § 1396u-2.

56. Federal law requires MDDHS to have "methods and procedures" to assure that payments to providers are consistent with "efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the Plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A).

57. Under EPSDT provisions, MDHHS must provide and make available all

15

the services listed in 42 U.S.C. § 1396d(a) when needed to correct or ameliorate a psychiatric, behavioral, or emotional condition. 42 U.S.C. § 1396d(r)(5). Just a few of the services included under 42 U.S.C. § 1396d(a) are: home health care services (42 U.S.C. § 1396d(a)(7)), rehabilitative services (42 U.S.C. § 1396d(a)(13)), community supported living arrangements (42 U.S.C. § 1396d(a)(23)), services in intermediate care facilities (42 U.S.C. § 1396a(a)(15)), and inpatient psychiatric hospitalization (42 U.S.C. § 1396a(a)(16)).

58. Michigan's Medicaid Provider Manual requires:

> Medically necessary services include habilitative or rehabilitative services that are expected to attain, maintain, or regain functional capacity and to achieve maximum health and function. A service need not cure a condition in order to be covered under EPSDT, and maintenance services or services that improve the child's current health condition are also covered in EPSDT because they ameliorate a condition. The common definition of ameliorate is "to make more tolerable." Thus, services such as physical and occupational therapy are covered when they have an ameliorative, maintenance purpose. Maintenance services are defined as services that sustain or support rather than those that cure or improve health problems.

Michigan Medicaid Provider Manual, EPSDT Chapter, Page 1.

59. Centers for Medicaid and Medicare Services' guidance similarly states:

> A service need not cure a condition in order to be covered under EPSDT. Services that maintain or improve the child's current health condition are also covered in EPSDT because they "ameliorate" a condition. Maintenance services are defined as services that sustain or support rather than those that cure or improve health problems. Services are covered when they prevent a condition from worsening

or prevent development of additional health problems. The common definition of "ameliorate" is to "make more tolerable."[4]

60. EPSDT services include all forms and types of behavioral health Medicaid services which are medically necessary for children.

61. MDHHS has mandated that each PIHP make EPSDT services available to children where medically necessary. These services include, among many others, crisis intervention, CLS, therapeutic foster care, targeted case management/intensive care coordination, and home and community based behavioral health services and supports.

## C.     The Americans with Disabilities Act (ADA).

62. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

63. Title II's implementing regulations require, under 28 C.F.R. § 35.130(d), that "[a] public entity shall administer services, programs, and activities in the

---

[4] U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services, *EPSDT - A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents* (June 2014) at page 10. https://www.medicaid.gov/medicaid/benefits/downloads/epsdt_coverage_guide.pdf (last visited June 5, 2018).

most integrated setting appropriate to the needs of qualified individuals with disabilities."

64. In passing the ADA, Congress recognized:

> [I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities; and
>
> [H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]

42 U.S.C. § 12101(a)(4), (a)(7).

65. The U.S. Supreme Court has held that segregation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, and economic independence." *Olmstead v. LC ex rel. Zimring*, 527 U.S. 581, 597-600 (1999).

66. Unjustified institutionalization constitutes a form of discrimination based on disability prohibited by Title II. *Id.* at 596.

18

67. According to the Department of Justice and several federal Courts of Appeals (including the 6th, 2nd, 4th, 7th, 9th, and 10th Circuits), a plaintiff makes out a valid *Olmstead* claim "by sufficiently alleging that they are at serious risk of institutionalization." *Waskul v. Washtenaw County Community Mental Health*, 979 F.3d 426, 461 (6th Cir. 2020); U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disability Act and Olmstead v. L.C.*, *available at:* http://www.ada.gov/olmstead/q&a_olmstead.htm.

**D.     Section 504 of the Rehabilitation Act of 1973.**

68. Like the ADA, Section 504 of the Rehabilitation Act prohibits discrimination of individuals with disabilities under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

69. Its implementing regulations require entities receiving federal financial assistance to "administer programs and activities in the most integrated setting appropriate. . ." 28 C.F.R. § 41.51(d).

70. The implementing regulations further prohibit the Defendants from directly, or through other arrangements, utilizing "criteria or methods of administration" that effectively subject individuals with disabilities to discrimination based on their disability or that "substantially impair accomplishment of the objectives" of the program. 28 C.F.R. § 41.51.

E.      **Procedural Due Process.**

71.  The right to procedural due process is guaranteed by the 14th Amendment of the United States Constitution.  Individuals have a constitutionally-protected property interest in public benefits, including Medicaid. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).

72.  Medicaid participants' hearing and notice rights under *Goldberg* are codified at 42 C.F.R. § 431.205(d): "The hearing system must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart."

73.  Under *Goldberg,* the state must provide "a meaningful notice stating the basis for the action and, when coverage is to be reduced or terminated, a pre-termination notice informing the claimant of the right to continue benefits pending a final administrative decision."

74.  The Medicaid Act requires that "[a] State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

75.  42 C.F.R. § 431.206 requires that a state provide notice of a beneficiary's right to a hearing and provide instructions on how to request it "[a]t the time of any action affecting his or her claim."

76. Medicaid beneficiaries who are enrolled in managed care plans are entitled to notice and opportunity for a hearing when the plan makes an "adverse benefit determination," which includes (a) denial or limited authorization of a requested service, including determinations based on the type or level of service, requirements for medical necessity, appropriateness, setting, or effectiveness of a covered benefit; (b) reduction, suspension, or termination of an authorized service; and (c) failure to provide a service in a timely manner.  42 C.F.R. § 438.400(b).

77. Managed care plans must give enrollees timely and adequate notice of an adverse benefit determination, including the reasons for the adverse benefit determination and the right to request an appeal.  42 C.F.R. § 438.404(b).

## VI.   FACTUAL BACKGROUND

78. MDHHS is failing to ensure that Medicaid beneficiaries under the age of 21 with behavioral, emotional, or psychiatric disorders receive medically necessary intensive home and community based services required by law.

79. Over the past few years, MDHHS has convened several workgroups to assess access to specialty mental health services.

80. One such workgroup was established and mandated by the Legislature, and consisted of PIHP network providers, MDDHS, CMHSPs, and others. It was established to "analyze the workforce challenges of recruitment and retention of staff who provide Medicaid-funded community living supports, personal care

services, respite services, skill building services, and other similar supports and services." *Recruitment and Retention Challenges for the Workforce Delivering the Most Frequently Used Supports and Services* (September 30, 2016), available at: https://www.michigan.gov/documents/mdhhs/Section_1009-3_530703_7.pdf.

81. This workgroup substantiated the difficulties Medicaid-funded agencies and beneficiaries have in attracting and retaining competent staff, which result in "negative outcomes and consequences for beneficiaries, their employers, direct support staff, the system of supports and services, and the state of Michigan." *Id*.

82. The workgroup concluded that "the direct support workforce is woefully understaffed, rendering the Medicaid funded supports and services delivery system unstable. This instability has led to declines in access and quality of the supports and services delivered." *Id*.

83. As early as 2016,[5] MDHHS knew it was not fulfilling its Medicaid mandates due to systemic problems with access to services, as evidenced by the workgroup's recommendations:

> After months of discussion and review of available data, the workgroup on the direct support workforce mandated by the Michigan Legislature has concluded that the critically important frontline workforce delivering face-to-face supports and services to the state's residents with intellectual and

---

[5] In fact, Michigan's direct care staffing problems go back at least to 2013, when the Office of Services on Aging of the Michigan Department of Community Health collected data on the direct-care workforce in home and community-based services (HCBS) programs. This statewide survey revealed significant staff recruitment and retention problems. *Findings from a Survey of Community Mental Health Provider Organizations*. Available at https://phinational.org/wp-content/uploads/2017/07/cmh-provider-survey.pdf (last visited February 2, 2022).

> developmental disabilities, mental illness, or substance use disorders is not stable. Employers, including individuals using self-determination as well as organizational employers are not able to recruit and retain a qualified, competent workforce. In order to fulfill the service and support requirements of both the state's Mental Health Code and the Medicaid program, additional state investments and new state policies and practices are needed to secure the dignity, well-being, and independence of people living with disabilities.

84. Despite the workgroup's dire findings, Defendants did little to improve the situation. In a 2019 report issued by another workgroup consisting of Region 6 providers, the workgroup concluded that:

> The findings in the 2016 1009 Report regarding the critical staffing shortage have not improved. Just as Direct Care Worker (DCW) wages are underfunded, so are the providers' reimbursement rates to be able to ensure quality care is supplied utilizing a stable workforce. There has been only one of the 1009 Report recommendations that were partially implemented, and this was a .50 increase to DCW wages. The wage increase had unintended negative consequences on providers.

> *Deconstructing the Direct Care Service Crisis* (2019). Available at https://docs.google.com/document/d/1oo7Q9vSVhYvj3ZWpzyhC9uVbxCig9792/edit (last visited February 2, 2022).

85. In a 2018 report, MDHHS highlighted the systemic problem of timely access to services, this time in the context of psychiatric hospitalization services.

86. MDHHS had convened a workgroup to evaluate access to psychiatric hospitalization services in Michigan. The workgroup reported that "the crisis in access to inpatient psychiatric services has continued unabated."[6]

87. MDHHS' report found that access is even more difficult for "individuals with complex needs, including (1) aggression, (2) intellectual and/or developmental disabilities (including Autism Spectrum Disorder), (3) substance use disorders, and (4) medical co-morbidities. Individuals with complex needs are also the most likely to be denied admission for inpatient psychiatric services." *Id*.

88. MDHHS further noted that limited access to treatment for children results in children cycling in and out of hospitals and jails:

> The sub-workgroup members also noted that there is a lack of continuity of care when the individual is discharged from one program or department to another resulting in the individual not receiving services in a timely fashion or receiving limited follow-up of services, which contributes to recidivism.
>
> The sub-workgroup members noted that (1) the limitations on mental health services at jails and jail diversion efforts and (2) ongoing barriers to accessing community-based services contribute to the increased demand for inpatient psychiatric services. The sub-workgroup members specifically highlighted that the shortage of crisis residential and after-care programs elevates the demand for inpatient psychiatric services.
>
> The sub-workgroup members also emphasized the role that staffing shortages and lack of specialized trainings for staff

---

[6] *Final Workgroup Report Michigan Inpatient Psychiatric Admissions Discussion*, MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES (Feb. 13, 2018), https://www.michigan.gov/documents/mdhhs/MIPAD_WorkgroupReport_613570_7.pdf

24

have across all service domains, which includes psychiatry, social work, nursing, behaviorists, and behavioral technicians.

*Id.* at 14.

89. Other reviews conducted recently by MDHHS have uncovered and highlighted significant contract violations which have resulted in hundreds, if not thousands, of children not receiving authorized medically necessary services. MDHHS has not demonstrated an ability to enforce compliance among the PIHPs with any meaningful outcomes for those most in need.

90. Despite annual reporting data reflecting problems of access to services for children with more intensive service needs, Defendants have not been providing intensive home and community based services, including mobile crisis services, to class members when medically necessary, and are wrongfully failing to provide such services in violation of federal law.

91. In addition to intensive mobile crisis services, Defendants are failing to provide class members with intensive care coordination, intensive home and community-based behavioral health services and supports, and therapeutic foster care, which are all coverable rehabilitation services under the Medicaid Act.

92. The children in the class cannot obtain the medically necessary treatment they require, resulting in, among other things, these children cycling in and out of the hospital, being boarded in emergency rooms, being removed from their home to receive treatment in segregated institutional settings, becoming wards or

dependents of the state, being jailed, unable to receive a proper education, and harmed because of the lack of provision of appropriate services.

93. The following are examples of the difficulties class members have faced in obtaining services under this poorly regulated system.

### The Plaintiff Children

#### D.D. (Genesee County)

94. D.D. is a 11-year-old Medicaid beneficiary from Genesee County, Michigan with significant mental health care needs. Due to lack of intensive home and community-based services, D.D. has been sent to emergency departments at least thirty times during mental health crises and has been placed in a residential treatment facility twice since 2019.

95. Over the course of his life, D.D. has been diagnosed with bipolar disorder, reactive attachment disorder ("RAD"), attention deficit hyperactivity disorder ("ADHD"), obsessive-compulsive disorder ("OCD"), oppositional defiant disorder ("ODD"), disruptive mood dysregulation disorder, Autism, insomnia, and anxiety.

96. D.D. is not the only child with significant mental health needs in his household. He has an 18-year-old brother who has been in and out of psychiatric hospitals for mental health treatment, and 3 other siblings with disabilities live in the family home.

97. D.D.'s mother describes her home as a "psychiatric ward" and has paid out of her own pocket for home modifications necessary to prevent harm to her children when mental health emergencies arise.

98. D.D. began showing signs of extreme hyperactivity at the age of 3. D.D. would not sleep for days and showed no connection with anyone. His mother describes him as a child who never stopped moving and experienced severe outbursts of rage from a very young age. D.D.'s rage manifested in behaviors that presented a harm to himself and others in the home, including banging his head, biting, pinching, and scratching himself or other people.

99. Since the age of 3, D.D. could not handle being told "no" or interruptions in a set schedule, he was unable to be around other people without direct supervision, and he exhibited an intolerance of water.

100. At the age of 3, D.D. was diagnosed with ADHD and Autism while he was at the Behavioral Health Unit of the Riley Children's Health Facility in Indianapolis.

101. D.D. was 4 years old when he first eloped from the family home. If his mother was unable to find him, she would call the police to help. While residing in Indiana, D.D. had a radio frequency tracker (which was provided by the County) affixed to his ankle so that the fire department could assist in locating him when his mother was unable to prevent an elopement or intervene during one. Once D.D.

moved to Lansing, Michigan, his mother began purchasing monitors to help find D.D. when he would elope. As D.D. got older, he learned to take off these monitors.

102. Elopements happened once or twice a month between the ages of 4 and 6. Elopements increased to once a week once D.D. relocated to Lansing, Michigan at the age of 6. From the time D.D. was 8 years old, he began attempting to elope on a daily basis, sometimes multiple times per day. His mother currently uses house alarms and motion detectors in addition to a personal monitor to monitor and attempt to prevent elopements. D.D. also has a history, since the age of 6, of eloping from school.

103. The family sought services for D.D. from the Community Mental Health Authority of Clinton, Eaton, & Ingham Counties ("CEI") after relocating to Lansing.

104. After completing an intake, D.D.'s mother was told he would have to be reassessed for Autism related services and was offered Medicaid covered individual therapy once a week and medication management. CEI failed to assess him for Autism services during the time D.D. was a CEI consumer. When his mother would call CEI, she was told by a CEI employee that there was a year waitlist for Autism assessment, and he was placed on that waitlist.

105. Over the course of his treatment at CEI, his diagnosis and medication

regiment changed several times. Despite the medication and individual therapy, D.D.'s behavioral issues grew more severe and frequent.

106. At the age of 8, D.D. moved to Flint, Michigan, where his mental health issues and behaviors worsened.

107. D.D. began receiving services from Genesee Health System, which initially provided him case management and medication management Medicaid services.

108. After case management and medication management proved ineffective, D.D.'s mother made repeated oral requests to his case manager at Genesee Health System for Medicaid covered individual therapy and respite services, which were denied without appropriate written notice of his appeal rights or explanation for why he did not qualify for those services.

109. D.D. was placed in Harbor Oaks Hospital in the summer of 2020 and suffered abuse from staff. He was discharged to his mother and, after a week at home, his mother called the police to intervene in a mental health emergency. The police took him to Hurley Hospital's emergency department, which discharged him the same day. After returning home for two weeks, his psychiatrist called the police to intervene in a mental health emergency, and he was taken to Sparrow Hospital's emergency department, where he stayed in the emergency department for 30 days waiting for a psychiatric bed to become available.

110. While in Sparrow Hospital, a supervisor at MDHHS, who his mother was working with to get him approved for placement at the Hawthorn Center,[7] advised his mother about additional Medicaid services that should be made available to him through the CMH, including wraparound, respite, and parent supports. Once advised of these specific services, his mother requested those service from Genesee Health System and was subsequently approved for each.

111. Beginning in the Fall of 2020 D.D. was authorized for case management, medication management, wraparound services, parent support, respite, and individual therapy. He has also worked with a behavioral specialist as a part of his plan of services, which was authorized and provided in the winter of 2020.

112. D.D. has worked with two different wraparound coordinators since 2020, and his wraparound benefit consists of a weekly meetings with D.D.'s behavioral specialist, therapist, mother, and wraparound coordinators. D.D.'s psychiatrist has never attended a wraparound meeting, and employees from his school rarely attend. As of the filing of this Amended Complaint, meetings consist of only D.D.'s wraparound coordinator and mother.

113. As described by his mother, D.D.'s first wraparound coordinator's weekly meetings consisted of an hour-long discussion of D.D.'s needs and

---

[7] The Hawthorne Center is a State run children's psychiatric hospital that provides intensive inpatient psychiatric services to children and adolescents.

brainstorming how the treatment team could meet those needs so that all parties were on the same page. With a second wraparound coordinator, who started in October 2021, the meetings have lasted about a half hour and are not focused on D.D.'s needs and how the treatment team will address those needs.

114. D.D. has Medicaid covered in-home respite care as a part of his plan of service with Genesee Health System. However, D.D. has only received his respite benefit twice, which consisted of an initial meeting and a single day of services provision. Genesee Health System has advised D.D.'s mother that she must provide this care as natural support due to the lack of available respite staffing. D.D.'s mother has never received written notice advising that this Medicaid-covered service has been terminated, nor been advised that she can challenge the failure to provide respite services in a Medicaid Fair Hearing.[8]

115. D.D.'s mother has been informed by Genesee Health System that she can access very limited mobile crisis services through the CMH. But mobile crisis services in Genesee County are only offered 9-5 on weekdays, and consist only of a crisis hotline number as opposed to timely mobile/on-site crisis services offered by a provider who is familiar with D.D.

---

[8] The failure to provide an authorized Medicaid service in a timely manner is an Adverse Benefit Determination which entitles a Medicaid consumer receiving specialty Medicaid services through a PIHP to written notice and advice of rights to appeal. 438.400(b)(4). Timely provision is defined by the State as providing the service within 14 days of authorization. Michigan Department of Health and Human Services, *Medicaid Managed Specialty Supports and Services Concurrent 1915(b)(c) Wavier Program FY 19 Attachment P 6.3.1.1, Grievance and Appeal Technical Requirement PIHP Grievance and Appeal System for Medicaid Beneficiaries*, https://www.michigan.gov/documents/mdhhs/Appeals_and_Grievances_Technical_Requirements_P-6-3-1-1_638444_7.pdf (Last Visited February 2, 2022).

116. Currently, the mobile crisis team at Genesee Health System will only come out until 7pm on weekdays. When a mental health emergency has arisen outside of the operating hours of the mobile crisis team, D.D.'s mother has had to call a 24/7 crisis hotline, which advised D.D.'s mother to take her son to the emergency department or call the police. When D.D.'s mother called the crisis line, she was also forced to wait on hold, sometimes for over an hour, before connecting with a CMH representative.

117. D.D. has never been able to access mobile crisis services outside of these limited operating hours.

118. D.D.'s mother has contacted the crisis line at least 6 times, and has been told each time to take D.D. to the emergency department or call the police. D.D.'s mother no longer calls the crisis line, and instead takes D.D. directly to the emergency room or calls the police directly.

119. D.D. has never been provided or offered intensive care coordination. The home-based services and supports authorized and contained in D.D.'s Individual Plan of Service ("IPOS") fail to correct or ameliorate his mental health condition.

120. D.D. was admitted to Pine Rest, a psychiatric hospital located in Gaines Township, Michigan in the summer of 2021, and stayed in that facility for two and half weeks.

121. Since his stay at Pine Rest in the summer of 2021, D.D.'s mother has been told by Genesee Health System staff that he can no longer go to Pine Rest due to lack of beds and his violent behaviors. Genesee Health System's staff have advised D.D.'s mother that he has a sufficient level of services to address his needs in the home, and that hospitalization is not necessary for him. However, D.D.'s mother continues to have to take him to his local emergency department whenever a mental health crisis arises.

122. When D.D. goes without necessary intensive home and community-based services, his behavior escalates and mental health crises occur in his family home. During mental health crises, D.D. has broken his mother's knee, shoulder, and wrist. D.D. has communicated homicidal intentions to his mother and those around him when in crisis.

123. As D.D. continues to go without intensive home and community-based services, he becomes stronger, bigger, and more capable of behavior that his aging mother cannot reasonably handle without the needed support and services in the home.

124. Since his Summer 2021 stay at Pine Rest, D.D. has been repeatedly denied psychiatric hospitalization at The Hawthorn Center and psychiatric units in private hospitals due to being considered too dangerous and due to hospital "bed" shortages. D.D. is repeatedly sent home from emergency departments and

residential treatment facilities without the intensive home and community-based services he requires.

### G.G. (Lapeer County)

125. G.G. is an 18-year-old Medicaid beneficiary. He has been diagnosed with bipolar disorder, ADHD, and his treating doctors have noted symptoms of schizophrenia. He also has a developmental disability of Down Syndrome.

126. G.G. is a Lapeer County Community Mental Health consumer who is not receiving the intensive home and community-based services he needs to correct or ameliorate his mental health conditions and reduce his behavioral symptoms.

127. G.G.'s biological grandparents (herein referred to as mother and father) have adopted G.G. He calls them "mom" and "dad." He is described as cuddly as a teddy bear until he has a "behavior" due to his mental health condition.

128. At the time G.G. resided in the family home, he weighed approximately 300 pounds. G.G.'s mental illness leads to severe behavioral outbursts, during which he has targeted his mother, who is petite and six inches shorter than he. G.G. will throw anything in sight during his outbursts.

129. As the result of G.G.'s problematic behaviors and lack of access to intensive home and community-based mental health services, his parents have had to replace all the windows in the home with plexiglass and remove their French doors, replacing them with steel ones. G.G.'s family regularly patches drywall and

replaces furniture on account of G.G. throwing things.

130. Throughout the week, G.G. resides in a residential treatment facility, Lighthouse Rehabilitation Center ("Lighthouse"), which is about 45 minutes from his home. His residency is paid for by the public-school system that he attended before Lighthouse. He began going to Lighthouse in 2011 or 2012, and the placement was initially covered by his community mental health provider.

131. In 2016, G.G.'s family received written notice that CMH would no longer fund services at Lighthouse over the summer break or on weekends because of issues with funding (not because of his condition having improved) resulting from alleged federal budget cuts. In the summer of 2017, G.G. came back home and the CMH authorized only CLS. The CMH did not authorize intensive care coordination, mobile crisis stabilization, and home and community based behavioral health services and supports. Even when the CMH authorized services, the CMH staff or contracted providers did not show up or provide the CLS services in the amount authorized in his IPOS. The CLS agency that the CMH contracted with suddenly stopped providing services altogether during the summer of 2017, leaving G.G. without services. No other provider was sent, and CLS services were not provided for the remainder of the summer without written notice issued communicating the adverse benefit determination due to failure to provide timely services.

132. By fall 2017, G.G. was back at Lighthouse during the week and returning home on the weekends. CMH could not find a CLS provider willing to serve G.G. on the weekends, even though G.G. required 24/7 care and supervision.

133. CMH refused to provide intensive home and community-based services during the weekend. CMH instead offered to place G.G. in Hawthorn, a state psychiatric hospital (despite there being a three-month waiting list at the time). G.G.'s parents refused to place G.G. at Hawthorn at this time due to their previous experience with G.G being hospitalized at Hawthorn and witnessing him being overmedicated there.

134. According to a behavior assessment dated January 18, 2018, G.G. had significant behavioral conditions both at Lighthouse and at home. These resulted in "severe temper tantrums, physical aggression (hitting, kicking, spitting, some biting, and throwing things at people), property destruction (throwing things, breaking things, knocking things over, tearing things down), and SIB [self injurious behavior] (biting himself and history of banging his head against hard surfaces)." These behaviors were a direct result of his mental illness and the lack of intensive home and community-based services provided.

135. For over nine months after the fall of 2017, CMH failed or refused to provide G.G. with intensive home and community-based services, including mobile crisis services, intensive care coordination, and intensive home and

community behavioral health services and supports. As a result, G.G.'s parents had to pay out of pocket to send him to Lighthouse during times of crisis. Instead of providing services, a CMH representative has advised the parents to work out a payment plan with the facility.

136. The CMH does not provide or offer intensive mobile crisis services in the county, nor will it offer or provide therapeutic foster care or home and community based behavioral health services (including CLS) on a consistent basis to G.G.

137. G.G. has not received written notices of the denials, suspensions, or failure to timely provide his Medicaid services, nor has he been advised of his right to request a hearing or appeal the denials of requests for Medicaid covered intensive home and community-based services.

138. Without the necessary mental health services G.G. needs, his condition will not improve. Without the necessary intensive home and community based mental health services, his behaviors and mental health condition continue to deteriorate, resulting in him being a safety risk to himself, the community, and his family.

### G.P. (Iron County)

139. G.P. is a 15-year-old Medicaid beneficiary diagnosed with ADHD and Intermittent Explosive Disorder, and tentatively diagnosed with unspecified bipolar

and a related disorder. She also has developmental disabilities, including Autism Spectrum Disorder and an Intellectual Development Disability.

140. G.P. is not receiving the intensive home and community-based mental health services she needs to correct or ameliorate her mental health conditions and address her behavioral symptoms.

141. G.P. began receiving mental and behavioral health services from Northpoint Community Mental Health since 2009.

142. G.P. has been in and out of the emergency department since she was 6 years old. G.P. would go to the emergency department one to two times per month on average, and police were called by her parents three to four times per month to assist with mental health crises. G.P. has be unable to obtain psychiatric hospitalization, because the private hospitals she visited refused to admit her and a representative from her community mental health denied her placement due to lack of beds and wanting her in the least restrictive setting.

143. G.P does not receive necessary intensive home and community-based mental health services.

144. G.P has been authorized for CLS, respite, medication management, and supports coordination as part of her care plan. The CLS and respite have been only sporadically provided due to lack of staff, and G.P.'s mother was required to obtain a provider on her own. Frequent staff turnovers contributed to the exacerbation of

G.P.'s mental and behavioral health symptoms. Despite Defendants' failure to provide these Medicaid services, G.P.'s mother did not receive written notice communicating any suspension or adverse benefit determination, nor was she advised of her right to a Medicaid Fair Hearing to challenge the failure to provide these services.

145. G.P.'s mother has repeatedly asked for more intensive home-based services, home modifications, and CLS, but has been repeatedly denied, despite the insurmountable evidence of need. G.P.'s mother began emailing these requests in 2017, and only then finally received denials in writing communicating her appeal rights. Prior to putting these requests in writing, G.P.'s mother would request increased services orally and would be denied without written notification.

146. As a result of the failure to provide intensive home and community-based services, G.P. has exhibited escalating behaviors, including putting her whole body through a glass window and chicken wire fencing; punching holes in walls; and throwing a metal coffee mug at her mother's head, which required her mother to be hospitalized.

147. CMH representatives have advised G.P.'s mother that service provision to G.P. is based on staffing availability, and the CMH has told G.P.'s mother to be patient and to utilize what can be offered to her. Although G.P. consistently received medication management and supports coordination, she regularly went

without CLS and respite, despite those services being identified as medically necessary in her IPOS.

148. Throughout the period that G.P. has sought services in the community that were not provided, G.P. has exhibited unmanageable behavior at home and with the staff that she did have (for ABA services), including striking staff and breaking and throwing objects. G.P. also has pulled her own hair and engaged in other self-injurious behavior while without intensive home and community-based services.

149. G.P.'s mother has been advised by ABA staff to abandon G.P. and give up custody of her to place her in the foster care system, so that G.P. can allegedly get the services she needs and to keep her younger sibling safe.

150. As a result of the Defendants' failure to provide intensive home and community-based services to address her mental health conditions and developmental disabilities, G.P. continues to be a safety risk to herself, the community, and her family.

151. G.P currently resides out of state at the Great Lakes Autism Center. She has been placed out of state since 2019. The Great Lakes Autism Center is discussing discharge in 2022 with the family. Her mother is gravely concerned about bringing her back home without the intensive home and community-based service array she needs.

**M.M. (Kent County)**

152. M.M. is a 14-year-old Medicaid beneficiary from Kent County, Michigan with significant mental health needs. M.M. has a long history of psychiatric hospitalization, placement outside the home in residential treatment facilities, and frequent trips to hospital emergency departments for mental health treatment.

153. M.M. has been diagnosed with schizophrenia and bipolar disorder. He received those diagnoses while hospitalized at the Hawthorne Center at the age of 10.

154. M.M. has been receiving services from Network 180 Community Mental Health since he was 7 years old. M.M. began receiving individual therapy, wraparound supports, medication management, and supports coordination.

155.  Wraparound supports consisted of a weekly meeting with some of M.M.'s treatment team. M.M.'s wraparound meetings involved M.M.'s mother, M.M., his therapist. and the wraparound coordinator, but M.M.'s psychiatrist and school did not participate in the wrap around meetings.

156. M.M. also had respite services approved in his care plan, but that service was terminated when he was 10 or 11 years old because of his behavioral issues. The termination of this service was communicated during a wraparound meeting and no written notice was provided explaining his appeal rights.

157. M.M. has been denied mobile crisis services by his CMH. M.M. is therefore required to call Family Outreach, the agency that provides his individual therapy, to obtain crisis services. When M.M. experiences a crisis, his family calls Family Outreach and is instructed to call the police and have him taken to the emergency room.

158. M.M. has been to the emergency department and his mother has had the police called on him over one hundred times since the age of 5 during mental health crises.

159. M.M. is currently residing in a residential treatment program out of the home at Wedgewood Christin Services, where he was placed by the Child welfare agency. M.M. has resided in Wedgewood since October 2020. M.M. has begun leaving the facility during the day to spend time with his family since August or September of 2021, and he receives no CMH services during these visits.

160. M.M. has exhibited violent behaviors toward police, hospital staff, and family members since the age of 5. His violence has resulted in Child Protective Services (CPS) being called to the family home by Network 180.

161.  CPS has opened several investigations since M.M. was 4 years old due to concerns for the safety of the other children in the home. A CPS worker advised M.M.'s mom about additional CMH services, such as CLS, and told the parent she would help her obtain those services through the CMH. However, instead of

assisting the family with obtaining increased support, a neglect charge was filed against M.M.'s mother. M.M.'s mother continues to be court involved due to on-going neglect charges.

162. M.M.'s most recent neglect charge resulted in him being placed in the Michigan foster care system in July 2021. M.M. was initially placed in Wellsprings foster care home in Kent County. He was moved to a group home in the Detroit area in August 2021. He was subsequently moved to his current placement at Wedgewood in October 2021.

163. M.M.'s mother has been told by CPS workers that they do not believe that she is a neglectful parent, but that M.M. must be in Michigan's foster care system in order to be placed at Wedgewood.

164. Since entering the foster care system, M.M.'s mother has participated in the reunification process and has not had her parental rights terminated. She attends the proceedings in the Juvenile court every three months as a part of her ongoing case.

165. In September 2021, M.M. was taken to the emergency room from Wedgewood after becoming violent with another resident. He was returned to Wedgewood after a brief stay in the emergency department.

166. Due to Defendants' failure to provide intensive home and community-based services necessary to meet his mental health needs, M.M. remains in an

institutional setting and unable to reside at home with his family.

### L.G. (Ogemaw County)

167. L.G. is a 16-year-old Medicaid Beneficiary from Ogemaw County, Michigan with significant mental health needs. L.G. has a long history of placement outside the home in residential treatment facilities, frequent trips to the emergency room for mental health treatment, and has had criminal charges filed against her due to behavioral issues.

168.  L.G. has been diagnosed with post-traumatic stress disorder, Reactive Attachment Disorder, and a mood disorder.

169. L.G. was adopted by her family and sought mental health services with Au Sable Valley CMH in 2016. L.G.'s mother was advised to pursue CMH service by a representative from the adoption subsidy office in Lansing, Michigan after seeking residential placement through her adoption subsidy. L.G.'s mother was advised that she must exhaust all available services in her local area before having residential placement approved by the adoption subsidy. L.G.'s mother contacted Au Sable CMH, did an intake, and a CMH representative performed an evaluation on L.G. A month from the initial intake, L.G. began receiving monthly individual therapy. L.G. received medication management and additional therapy through her private insurance before and during her time as a CMH consumer.

170. After receiving some mental health services through the CMH, L.G.'s

44

mother again pursued residential placement through her adoption subsidy and was told she had not exhausted *all* of the home and community-based services offered through her CMH.

171. L.G. mother then requested all available services through her CMH and was authorized for wraparound, CLS, respite, and the previously authorized individual therapy.

172. However, since being determined eligible for respite, CLS, individual therapy, and wraparound mental health services by the CMH, she has only sporadically been provided any of these services, and only then on an inconsistent basis. These services were also not intensive and did not meet L.G.'s needs. Since 2017, L.G. has had at least 13 different CLS/Respite workers and three different wraparound coordinators.

173. L.G.'s mother has filed three Office of Recipient Rights complaints related to the failure to provide services and the low quality of the services she has received, all of which have been substantiated in her favor. Substantiated complaints related to the failure to provide authorized Medicaid services.

174. In L.G.'s county, there are no mobile crisis services available, and L.G.'s family has been forced to call the police or take L.G. to the hospital emergency department when she experiences a mental health crisis.

175. In August, 2019 L.G. was placed in a residential treatment facility in

California, which was covered by the family's private insurance carrier. This placement was required after the Medicaid home and community-based services provided failed to correct or ameliorate L.G.'s mental illness. After 28 days in the facility, she was expelled due to behavior. L.G.'s private insurance would not cover intensive home and community-based services or additional in-home supports beyond the individual therapy and medication management she was receiving. L.G. mother paid over $4,000 for airfare and accommodations to facilitate the California placement, which required her to refinance her home to cover those costs. Once L.G. returned to Michigan, she was denied residential placement by both her CMH and the adoption subsidy.

176. Due to L.G.'s frequent need for hospitalization, police intervention, and the family's inability to obtain appropriate intensive home and community-based services, her mother was advised by a CMH employee to file incorrigibility charges against her daughter, as that was the only way she would qualify for residential treatment. L.G.'s mother followed that advice and filed criminal charges against her daughter in the spring of 2020.

177. In October 2021, L.G. was placed in Wedgewood, a residential treatment facility in Michigan, for six months. This move was coordinated by her probation officer and the adoption subsidy, and was financed by her adoption subsidy.

178. In April 2021, after discharge from Wedgewood, L.G. was sent to a Blodgett residential treatment facility in Michigan, which is a facility for long-term psychiatric inpatient stays, until July of 2021. This placement was also covered by her adoption subsidy as a step-down program due to a 6-month cap on residential placement under the subsidy.

179. After being discharged from Blodget, L.G. returned home, where the home and community-based services provided have continued to be insufficient. L.G. has continued to deteriorate since returning home, leading her mother to again seek residential placement. Residential placement was subsequently ordered by the judge assigned to her criminal matter, and L.G. is currently awaiting residential placement once an opening becomes available.

### S.W. (Oakland County)

180. S.W. is a 15-year-old Medicaid Beneficiary from Oakland County, Michigan with significant mental health needs. S.W. has a long history of placements in residential treatment facilities, has frequently experienced mental health crises, has been taken to the hospital emergency department for mental health treatment, and has had criminal charges filed against him for behaviors due to his unaddressed mental health conditions.

181. S.W. was adopted by his parents at 10 months. He immediately showed symptoms of mental illness: he would rarely sleep, was constantly active, and was

continuously upset. As a young child, S.W. did not wish to be held, was continuously agitated, appeared nervous throughout the day, would scream throughout the day, and was inconsolable during bouts of rage.

182. S.W. received his first neuropsychological evaluation at the age of 5 and received multiple mental health diagnoses. S.W. was diagnosed with ADHD, ODD, RAD, and mixed receptive-expressive language disorder.

183. At the age of nine, S.W. began receiving mental health services from OCHN. S.W. was authorized for individual therapy, respite, CLS and wraparound, but experienced frequent staffing changes with his treatment team and did not receive appropriate intensive home and community-based services:

    a. While a CMH consumer, S.W. received therapy from 4 different therapists.

    b. Despite having respite included in his plan of service, K.M. did not receive that service. After the services were authorized and determined medically necessary, S.W.'s CMH case manager and wraparound coordinator advised that there were no CLS or respite providers, and that the family must find their own providers. S.W.'s mother never received written notice communicating the reason for failing to provide services in the IPOS.

    c. After a year of being a CMH consumer, S.W. was provided CLS for

the first time, but these services were provided sporadically and inconsistently for the rest of his time as a OCHN consumer. When the CMH found staff to provide CLS, the staff would leave shortly after starting, and no written notice was provided when the CMH failed to locate another provider.

    d.  S.W. has never received the respite benefit contained in his plan.

184. At the age of twelve, S.W.'s Medicaid services were terminated. His family disagreed that they should end and fought this termination; they successfully reinstated his services by enlisting the help of a supervisor at MDHHS. His mother did not receive written notice communicating the termination and the reasons why he was being terminated. The termination resulted in S.W. losing the therapist he'd been working with for the last year, requiring S.W. to find a new therapist.

185. Once OCHN developed a mobile crisis hotline, S.W. was determined to need crisis services, but the services only consisted of a phone number S.W.'s family could call to speak with a crisis worker when S.W. was in crisis. S.W. never received mobile crisis (intervention) services, and the family was repeatedly told to simply call the police or take S.W. to the hospital emergency department during a mental health crisis.

186. The police have become very familiar with S.W., having been called to

the family's home since he was five. Police were called when S.W. eloped, was suicidal, or was threatening or engaging in violence against his family.

187. At the age of 12, S.W.'s parents pressed charges against him at the request of the responding police officers. He was placed in diversion after a judge determined that he had a disability and that his needs were not being met.

188. S.W. was eventually charged with incorrigibility in 2020.

189. S.W. was placed in Harbor Oaks, a residential care facility, by his family in February 2021, but was discharged after eleven days. This placement was paid for by his private insurance and was required due to the lack of intensive home and community-based services in the home.

190. S.W. was taken to the emergency room at Beaumont Hospital after another suicide attempt on February 19th, days after he was discharged from Harbor Oaks.

191. S.W. was then placed by the family in a residential facility in Georgia, where he stayed for 13 weeks after the second suicide attempt. Despite the Georgia facility recommending therapeutic foster care or group home placement before returning to his family home, S.W. was discharged back to his parents with the same minimal mental health services and supports. S.W.'s family was told by CMH representatives responsible for providing services to S.W. that therapeutic foster care and group home placement are only available to children in foster care

in Michigan. An individual working for the local Court advised the family that, if they released their parental rights, it would create additional placement options for S.W. S.W.'s parents refused to release their rights.

192. The CMH provided no intensive home and community-based services to S.W and, within days of being home, S.W. experienced another crisis and was placed in Family Youth Intervention, a residential treatment facility, for 6 days.

193. S.W.'s parents were asked to come pick him up from Family Youth Intervention because he was actively suicidal with a plan. His parents took him to Beaumont Hospital in Troy, Michigan, where he awaited placement in a psychiatric hospital.

194. The family then contacted their State Legislator, and S.W. was approved by MDHHS for admission to the state hospital, Hawthorn, in June 2021. He would stay in Hawthorn until September 15, 2021.

195. After being told that S.W. would be discharged from Hawthorn, the family located a facility in Indiana that agreed to take S.W. S.W.'s parents elected to send him there because they were desperate, and because S.W. was not receiving the intensive home and community-based mental health services he needed in their home or in the community. The family has been required to pay out of their own pocket for this residential placement, and was told by a OCHN representative that the CMH would close S.W.'s case due to his out of state

placement.

196. SW had his Medicaid terminated due to out of state placement on January 21, 2022.

197. With the assistance of his legal counsel in this matter, he was found eligible for Medicaid services and has reapplied for home and community-based services with OCHN. Since returning to Michigan, he has resided in an apartment, with his parents splitting time to ensure his safety and the safety of those around him.

**K.M. (Kent County)**

198. K.M is a 13-year-old Medicaid Beneficiary from Kent County, Michigan with significant mental health needs. K.M. has a history of placement in residential treatment facilities and has been taken to hospital emergency departments due to experiencing mental health crises. He has had criminal charges brought against him due to his behavior resulting from his mental illness.

199. K.M. was adopted by his family from Ethiopia when he was 14 months old. He is the middle child in his family and has a younger and older brother who are the biological children of his mother and father.

200. Before being brought to America, K.M. lost his birth mother and had been moved to multiple placements within his home county.

201. K.M. was brought to Michigan from Ethiopia at 14 months and quickly

began exhibiting signs of mental illness.

202. K.M. was not able to be comforted when upset; cried and screamed constantly; and engaged in long, uncontrollable tantrums.

203. K.M.'s parents tried to enroll him in Tri-Unity Christian School at the age of three. He began school on a limited schedule, 2 and a half hours per day for two days a week, but was expelled from school after two weeks for behaviors.

204. K.M. began receiving individual therapy at the age of 3.

205. Since birth, K.M. had issues with his sleep. He became unable to sleep for long periods of time, only taking short naps, and became active throughout the night. Around the age of 3, his parent sought medical treatment for his sleep issues from an ear, nose, and throat doctor.

206. After treatment from the ear, nose, and throat doctor proved ineffective, at age 5 K.M. began seeing a psychiatrist for his sleep and rage issues.

207. K.M. received a diagnosis of ADHD and began taking medications for sleep and ADHD as prescribed by his treating psychiatrist.

208. K.M. began receiving services from Network 180 CMH at age 6. He received individual therapy in the home. The services were provided consistently but were not sufficiently intensive to meet his needs. As a result, the symptoms and behaviors exhibited due to K.M.'s mental illness continued to worsen.

209. At the age of 7, K.M. was authorized for services under the SED

waiver, including wraparound, CLS, music therapy, and equine therapy. While he received the therapies authorized in the plan with minimal issues during the COVID pandemic, his authorized CLS services were sporadically and inconsistently provided due to the CMH's failure to provide CLS workers in the home. The CLS authorization was limited to 3 hours a week. K.M.'s family received no written notice regarding the failure to provide the CLS benefit, nor were they advised that they could file a Medicaid Fair Hearing related to the failure to provide services in the IPOS.

210. During the time K.M. was receiving CLS, he had at least 6 different CLS workers. Most quit their jobs before working 6 months with him, but he was able to keep working with one staff member for almost a year in 2018.

211. K.M. was taken to the DeVos Children's hospital emergency department after a mental health crisis for the first time at the age of 8. At discharge K.M.'s parents were told by hospital staff that they were concerned about the safety of the other children living in K.M.'s home. Despite these concerns, the hospital threatened to call CPS if his family did not come pick up K.M. immediately. No intensive home and community based mental health services were offered or provided by the CMH in addition to the current content of his plan of service after discharge. To avoid a CPS case, K.M.'s parents moved his siblings out of the home for months to ensure their safety after discharge.

212. At the age of 11, K.M. was terminated from the SED waiver and told that the termination was because he had been on the waiver too long. The impact of his removal from the SED wavier caused him to lose his respite benefit and wraparound benefit, and K.M.'s parents were told that he could no longer receive the authorized CLS services due to lack of available staffing. K.M.'s parents have no recollection of receiving written notice communicating the termination of his respite or CLS benefit and believe this was communicated to them verbally by their therapist at the time.

213. After the start of the COVID-19 pandemic, K.M.'s behaviors continued to escalate and remote services proved to be ineffective for him.

214. K.M.'s family repeatedly asked for CLS services and additional home and community-based mental health services, but those requests were denied without written notice.

215. In 2021 K.M. was advised he would qualify for mobile crisis services, but when K.M.'s family called the crisis line, they were referred to Arbor Circle, the CMH contracted service provider through which he receives therapy, and advised to obtain crisis services through that entity.

216. When K.M.'s mother contacted Arbor Circle for the first time in 2021, during a crisis where K.M. was exhibiting homicidal ideation, rage, and destroying property, the provider did not respond to provide the crisis evaluation until 3 days

later. While the family waited for the evaluation to be completed, the police were contacted to assist the family during the ongoing crisis. The evaluation was eventually completed over Zoom, and the provider then advised K.M.'s mother that the CMH must approve hospitalization. K.M. was taken to Helen Devos Children's hospital after the evaluation and remained there overnight. K.M. was subsequently transferred to Pine Rest, an in-patient treatment facility, for a 12 day in-patient stay.

217. Within two hours of returning home from Pine Rest, K.M. was in a rage and his parents contacted the CMH for an emergency medication review.

218. Despite K.M. hallucinating, a symptom that was not common for him, his medications were not reviewed until 48 hours after discharge from Pine Rest.

219. The crisis that resulted in the in-patient stay at Pine Rest also resulted in criminal charges being filed by the responding police officers against K.M for domestic violence and malicious destruction of property. A family friend advised that criminal charges would give K.M. access to residential placement options that the CMH would not cover.

220. K.M. experienced another mental health crisis in January 2022. K.M.'s mother contacted Arbor Circle's crisis line and was advised to reach out to his therapist for assistance. When K.M.'s therapist did not respond to the contact, his mother called the police for assistance. The police called for an ambulance. K.M.

was taken to Helen DeVos Children's Hospital and was subsequently transferred to Pine Rest a second time for a 7 day in-patient stay.

221. As of the filing of this Complaint, K.M. only receives individual therapy from the CMH. The CMH has never provided the intensive home and community-based services K.M. needs to remain in his family home, including, but not limited to, CLS, Wraparound, Intensive Care Coordination, and effective Mobile Crisis services.

## VI.   CLAIMS FOR RELIEF

### Count I - Violation of the Federal Medicaid Early and Periodic Screening, Diagnostic and Treatment (EPSDT) Mandate (Defendant Hertel)

222. The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

223. In violation of the EPSDT provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(r)(5), and 1396a(a)(43)(C), the Defendants, while acting under the color of law, have failed to provide the Plaintiffs and Class Members with intensive home and community-based mental health services necessary to correct or ameliorate their conditions.

224. In violation of the EPSDT provisions of the Medicaid Act, the Defendants, while acting under the color of law, have failed to "arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment [intensive home and community-based mental health

services]" to the Plaintiffs and Class Members pursuant to 42 U.S.C. § 1396a(a)(43)(C).

225. The Defendants have repeatedly and knowingly violated Plaintiffs' and the Class Members' rights under the EPSDT Mandate, rights enforceable pursuant to 42 U.S.C. § 1983.

### Count II - Violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq*. (Defendant Hertel)

226. The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

227. Title II of the ADA provides that no qualified person with a disability shall be subjected to discrimination by a public entity. 42 U.S.C. §§ 12131-32. It requires public entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *See* 28 C.F.R. § 35.130(d).

228. The Plaintiffs and Class Members are "qualified individuals with a disability" within the meaning of the ADA in that they have physical and/or mental impairments that substantially limit one or more major life activities, including their ability to live independently without support.

229. The Plaintiffs and Class Members are entitled by law to receive Medicaid specialty mental health services, including by requiring services necessary to remain in their homes in the community.

230. The Defendants, who are responsible for administering Michigan's Medicaid program in accordance with state and federal law, are subject to Title II of the ADA. 42 U.S.C. §§ 12131(1)(A) and (B) (1990).

231. The Defendants are obligated under the ADA to administer MDHHS' programs in a manner that enables qualified individuals with disabilities to live in the most integrated setting appropriate to their needs. The Defendants' failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (intensive home and community-based mental health services) for qualified individuals with disabilities such as the Plaintiffs and Class Members has placed the Plaintiffs and the Class Members at serious risk of institutionalization, in violation of the ADA's integration mandate.

232. The Defendants have discriminated against qualified individuals with disabilities such as the Plaintiffs and Class Members by failing to provide reasonable modifications to programs and services in order to arrange for intensive home and community-based medically necessary mental health services.

233. The Defendants have utilized criteria and methods of administration that subject the Plaintiffs, Class Members, and other qualified individuals with disabilities to discrimination on the basis of disability, including risk of unnecessary institutionalization, in ways that include failing to take the necessary steps to arrange for medically necessary intensive home and community-based

mental health services.

234. The Defendants' actions are in violation of Title II of the ADA. The Plaintiffs and Class Members are entitled to declaratory and injunctive relief, and reasonable attorneys' fees and costs incurred in bringing this action, pursuant to 42 U.S.C. § 12133.

**Count III - Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. (both Defendants)**

235. The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

236. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits public entities and recipients of federal funds from discriminating against any individual by reason of disability. Public and federally-funded entities must provide programs and activities "in the most integrated setting appropriate to the needs of the qualified individual with a disability." *See* 28 C.F.R. § 41.51(d).

237. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, together with its implementing regulations, including 28 C.F.R. § 41.51(d) and 45 C.F.R. § 84.4(b)(vii)(2), and the right of action granted by 29 U.S.C. § 794a, are all construed *in pari materia* with the ADA with respect to *Olmstead*/"most integrated setting" claims.

238. Policies, practices, and procedures that have the effects of unjustifiably segregating persons with disabilities in institutions constitute prohibited

discrimination under Section 504. The Plaintiffs and Class Members are "qualified individuals with a disability" under Section 504 of the Rehabilitation Act of 1973 in that they have physical and/or mental impairments that substantially limit one or more major life activities, including their ability to live independently without support.

239. The Plaintiffs and Class Members meet the eligibility requirements for Michigan Medicaid services, including services necessary to maintain them in their homes in the community.

240. Defendant MDHHS is a recipient of federal funds and is therefore a government entity subject to Section 504. 29 U.S.C. § 794(b). Defendants' failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (intensive home and community-based mental health services) to the Plaintiffs and Class Members places them at risk of institutionalization in violation of Section 504's integration mandate.

241. The Defendants have utilized criteria and methods of administration that subject qualified individuals with disabilities such as the Plaintiffs and Class Members to discrimination on the basis of disability, including risk of unnecessary institutionalization, by the Defendants' failure to arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment (intensive home and community-based mental health services) to the Plaintiffs and

Class Members.

242. By continuing to participate in the Medicaid program, and continuing to accept federal funding therefor, after enactment of 42 U.S.C. § 2000d-7, the State of Michigan has waived its Eleventh Amendment immunity for claims under the Rehabilitation Act related to its conduct of the Medicaid program.

243. Plaintiffs have a right to relief under 29 U.S.C. § 794a against Defendants Hertel and MDHHS for violation of Section 504 of the Rehabilitation Act to the same extent that they have a right to relief against Defendant Hertel as alleged in Count II.

## Count IV - Violation of the Due Process Provisions of the Federal Medicaid Act. (Defendant Hertel)

244. The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

245. The Medicaid Act requires that participating states provide an opportunity for a fair hearing for any individual whose requests for Medicaid services have been denied or not provided with reasonable promptness.  42 U.S.C. § 1396a(a)(3).

246. The Defendants have failed to establish and maintain customs, policies, and practices to provide Plaintiffs and members of the Plaintiff Class with adequate written notice of reductions, terminations, and denials of Medicaid funded intensive home and community-based mental health services and their

rights to a denial, pre-termination or reduction fair hearing, in violation of 42 U.S.C. § 1396a(a)(3).

247. The Defendants' violations have been repeated and knowing and entitle the Plaintiffs to relief pursuant to 42 U.S.C. § 1983.

### Count V - Violation of the Due Process Provision of the Fourteenth Amendment of the United States Constitution. (Defendant Hertel)

248. The Plaintiffs re-allege and incorporate herein by reference each and every allegation and paragraph set forth previously.

249. The Due Process Clause of the United States Constitution established the right for the Plaintiffs and members of the Plaintiff Class to receive notice of reductions, terminations, and denials of Medicaid funded services and their right to a fair hearing to challenge such actions prior to implementation. *See Goldberg v. Kelly*, 397 U.S. 254 (1970); 42 U.S.C. § 1396a(a)(3).

250. The Defendants have failed to establish and maintain customs, policies, and practices to provide the Plaintiffs and members of the Plaintiff class with adequate written notice of reductions, terminations, and denials of Medicaid funded intensive home and community-based mental health services and their rights to a pre-termination or reduction fair hearing, in violation of the Due Process clause of the Fourteenth Amendment of the Constitution.

251. The Defendants' violations have been repeated and knowing and entitle the Plaintiffs to relief pursuant to 42 U.S.C. § 1983.

## VII.  REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs request that the Court order the following relief and remedies on behalf of themselves and all others similarly situated:

a.  Certify a Class Action;

b.  Issue a declaratory judgment in favor of the Plaintiffs and the Class that the Defendants have failed to comply with the requirements of the Medicaid Act, Due Process, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and related law;

c.  Declare unlawful the Defendants' failure to arrange directly or through referral to appropriate agencies, organizations, or individuals, necessary treatment (intensive home and community-based mental health services) to the Plaintiffs and Class Members;

d.  Issue preliminary and permanent injunctive relief enjoining the Defendants from subjecting the Plaintiffs and Class Members to practices that violate their rights under the Medicaid Act, Due Process, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and related law;

e.  Issue preliminary and permanent injunctive relief requiring the Defendants to arrange, directly or through referral to appropriate agencies, organizations, or individuals, necessary treatment (intensive home and community-based mental health services) to the Plaintiffs and Class Members;

f.  Retain jurisdiction over the Defendants until such time as the Court is satisfied that the Defendants' unlawful policies, practices, and acts complained of herein cannot recur;

g.  Award the Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1988, 12133 and 12205; and any other applicable law or regulation; and

h.  Grant such other and further relief as the Court deems to be just and equitable.

Dated:  February 9, 2022                    Respectfully submitted,

**MANTESE HONIGMAN, P.C.**

*Attorneys for Plaintiffs*
By: */s/ Dave Honigman*
David M. Honigman (P33146)
dhonigman@manteselaw.com
By: */s/Gerard V. Mantese*
Gerard V. Mantese (P34424)
gmantese@manteselaw.com
Theresamarie Mantese (P53275)
tmantese@manteselaw.com
Emily S. Fields (P82047)
efields@manteselaw.com
1361 E. Big Beaver Rd.
Troy, MI  48083
(248) 457-9200

**DISABILITY RIGHTS MICHIGAN**

*/s/ Kyle M. Williams*
Kyle M. Williams (P77227)
kwilliams@drmich.org
*/s/ Nicholas A. Gable*
Nicholas A. Gable (P79069)
ngable@drmich.org
Attorneys for Plaintiffs
4095 Legacy Parkway
Lansing, MI  48911
(517) 487-1755

**NATIONAL HEALTH LAW PROGRAM**

*/s/ Kimberly Lewis*

65

Kimberly Lewis (CA – 144879)
lewis@healthlaw.org
Attorney for Plaintiffs
3701 Wilshire Blvd., Ste. 750
Los Angeles, CA 90010
(919) 968-6308

**JOHN J. CONWAY PC**

*/s/ John J. Conway*
John J. Conway (P56659)
jj@jjconwaylaw.com
Attorney for Plaintiffs
26622 Woodward Ave., Ste. 225
Royal Oak, MI  48067
(313) 961-6525