UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

D.D., BY NEXT FRIEND B.N., *et al.*,

              Plaintiffs,                    Case No. 1:18-cv-11795

v.                                   Honorable Thomas L. Ludington
                                   United States District Judge

MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES and ELIZABETH HERTEL,

              Defendants.

_____/

## OPINION AND ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND GRANTING MOTION FOR ATTORNEYS' FEES

Federal law requires the State of Michigan to provide Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) services to all Medicaid-eligible children under the age of 21 with reasonable promptness. On June 6, 2018, Plaintiffs—seven children receiving Medicaid benefits for mental-health conditions—brought a class action against Michigan State officials and entities. They alleged that Michigan is not providing them home- and community-based services (HCBS) for mental health with reasonable promptness, if at all, posing a risk of their institutionalization. Plaintiffs thus sought declaratory and injunctive relief to mandate Michigan's compliance with federal law.

After a partially successful motion to dismiss, the case transitioned to a settlement posture. Indeed, on August 11, 2020, the Parties filed an Interim Settlement Agreement while they negotiated a final agreement. After that, Plaintiffs sought certification of their putative class, which was certified without opposition. The Parties then continued to negotiate a final agreement. On January 17, 2025, once the Parties reached a final agreement, Plaintiffs moved for preliminary approval of that class settlement. Soon after, the Parties' settlement was preliminarily approved.

As a result, notice of the settlement was directed to the absent class members. After receiving notice, no one has objected to the settlement.

Plaintiffs now move for final approval of the class settlement. Consistent with the settlement, Plaintiffs' attorneys also seek an attorneys' fee award for their work on this case. For the reasons explained below, both the Motion for Final Approval and Motion for Attorneys' Fees will be granted.

# I.

## A. General Case Background

This case involves Michigan's compliance with the Federal Medicaid Program, the Americans with Disabilities Act (ADA), § 504 of the Rehabilitation Act of 1973, and procedural due process. ECF No. 71 at PageID.1190–91. Federal and State governments jointly fund Medicaid under Title XIX of the Social Security Act. *See* 42 U.S.C. § 1296 *et seq.* States participating in Medicaid, like Michigan, must provide Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) services[1] to eligible children under the age of 21. 42 U.S.C. §§ 1396a(a)(10)(A), (4)(B), (43), 1396d(r).

Michigan receives Medicaid funds to provide health services. ECF No. 71 at PageID.1197–98. Specifically, as with other states partaking in the Medicaid Program, Michigan receives reimbursement from the federal government for part of the cost of providing benefits. *Id.* at

---

[1] The MDHHS must provide EPSDT services with reasonable promptness. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930(a). EPSDT services encompass a range of screening, diagnostic, and treatment services. *See Early and Periodic Screening, Diagnostic, and Treatment*, MEDICAID.GOV, https://www.medicaid.gov/medicaid/benefits/early-and-periodic-screening-diagnostic-and-treatment/index.html [https://perma.cc/8MY6-AG5Y]. In fact, EPSDT services include all 31 services listed under § 1396d(a). These services include home health-care services, *id.* § 1396d(a)(7), rehabilitative services, *id.* § 1396d(a)(13), arrangements for community-supported living, *id.* § 1396d(a)(23), services in intermediate-care facilities, *id.* § 1396d(a)(15), and inpatient psychiatric hospitalization, *id.* § 1396d(a)(16).

PageID.1196. And the Michigan Department of Health and Human Services (MDHHS) administers the Medicaid Program. ECF No. 77 at PageID.1470–71. To fulfill that responsibility, MDHHS contracts with ten Prepaid Inpatient Health Plans (PIHPs), which in turn contract with Community Mental Health Service Providers to deliver home- and community-based services in assigned regions. *Id.*

But Plaintiffs contend the PIHPs, and thus the MDHHS, have not fulfilled Medicaid's requirements. ECF No. 71. So Plaintiffs brought this case in June 2018 against the MDHHS, its then Director Nick Lyon,[2] and the Governor of Michigan. ECF No. 1. The Governor has since been dismissed. ECF No. 59.

Plaintiffs are seven Medicaid-eligible beneficiaries under the age of 21 allegedly injured by Defendant's failure to provide the required EPSDT services promptly, if at all. *See generally* ECF No. 71. D.D., age 11, has visited emergency rooms more than 30 times for mental health crises. *See id.* at PageID.1211. G.G., 18, suffers from ADHD, bipolar disorder, and Down Syndrome, and his outbursts turn violent and destructive. *Id.* at PageID.1219, 1221. L.G., 16, has PTSD, Reactive Attachment Disorder, and a mood disorder; on a mental health worker's advice, her mother had to seek criminal charges against her just to secure residential treatment. *Id.* at PageID.1230–31. S.W., 15, has attempted suicide multiple times. *Id.* at PageID.1235. M.M., 14, has schizophrenia and bipolar disorder and is institutionalized. *Id.* at PageID.1226–27. G.P., 15, has ADHD and Intermittent Explosive Disorder; her parents were told foster care was the only way to obtain treatment. *Id.* at PageID.1225. K.M., 13, has homicidal ideation, rage, and a history

---

[2] Under Civil Rule 25(d), MDHHS Director Elizabeth Hertel has since replaced former Director Nick Lyon. *See* ECF No. 71; *see also* ECF Nos. 108 at PageID.1661, n.2.

of property destruction; she cannot live at home and has lost community support services due to staffing shortages. *Id.* at PageID.1240–42.

Plaintiffs first filed a six-count Complaint, asserting class allegations.[3] ECF No. 1. But after a partially successful motion to dismiss, the remaining claims included violations of the Federal Medicaid Early and Periodic Screening Diagnostic and Treatment Mandate (Count I), the ADA (Count II), and § 504 of the Rehabilitation Act (Count III). Plaintiffs also alleged a violation of the due-process provisions of the Federal Medicaid Act (Count IV) and the Fourteenth Amendment (Count V). ECF No. 71. Plaintiffs sought the following relief for these claims:

(1) a declaratory judgment that Defendants have not complied with certain provisions of the previously mentioned acts;

(2) a declaration that Defendants unlawfully failed to provide certain services to Plaintiffs and Class Members;

(3) a preliminary injunction permanently enjoining Defendants from violating the rights of Plaintiffs and Class Members;

(4) a preliminary injunction permanently mandating Defendants to arrange treatment for Plaintiffs and Class Members;

(5) costs and attorney's fees; and

(6) for this Court to retain jurisdiction "until such time as [it] is satisfied that the Defendants' unlawful policies, practices, and acts . . . cannot recur[.]"

*Id.* at PageID.1249. And Plaintiffs proposed that the class included the following people:

All Medicaid-eligible beneficiaries under the age of 21 in the State of Michigan for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has determined, through an assessment, that intensive [HCBS] are needed to correct or ameliorate their emotional, behavioral, or psychiatric condition.

ECF No. 77 at PageID.1468.

---

[3] The case was initially filed as *K.B., et al. v. Michigan Department of Health and Human Services, et al.*, but K.B. is no longer a Plaintiff. *See* ECF No. 71; *see also* ECF No. 108-2 at PageID.1687.

In August 2020, the Parties filed an Interim Agreement that outlined their goals, commitments, and expected achievements while negotiating a final agreement. *See generally* ECF No. 50. The Agreement highlighted the expectation that Michigan would produce various "implementation plan[s]." *Id*. at PageID.1077–80. These plans were to outline Michigan's commitment to providing HCBS to eligible children timely and effectively, ensuring the quality and adequacy of the PIHPs' capacity throughout Michigan, and conducting effective outreach. *Id*. The Parties amended the Interim Agreement in November 2021 to permit Plaintiffs to file an amended complaint and a motion for class certification. ECF No. 64 at PageID.1162. Once Plaintiffs filed the Amended Complaint, ECF No. 71, and moved for class certification, ECF Nos. 76; 77,[4] this Court certified the Class under Civil Rule 23(a) and (b)(2) and appointed Attorney David Honigman as Class Counsel on November 3, 2022. ECF No. 83. After that, the Parties continued to negotiate a final class settlement. *See* ECF Nos. 86; 87; 88; 90; 91; 92; 93; 94; 95; 96; 97; 99; 101; 102; 103; 105; 106.

## B. Class Settlement

### 1. The Agreement

After years of negotiation, in December 2024, the Parties reached a final Settlement Agreement. *See* ECF No. 108-2. In general, the Settlement Agreement outlines clear goals and commitments that require MDHHS to identify the services they must provide, define the children entitled to them, establish a consistent assessment process, provide timely access to services, and create tools to measure quality and transparency. *Id.* at PageID.1693–94. It also alters and

---

[4] The Defendants did "not object" to certification, but "reserve[d] the right to challenge the facts and allegations brought forth in [Plaintiffs'] Amended Motion for Class Certification and to move to de-certify the class should circumstances warrant it." ECF No. 79 at PageID.1536–37.

augments various aspects of MDHHS's current services and procedures related to them. *See generally id.*

**Key Commitments.** Drilling down into the specifics, the Settlement Agreement contains eight key commitments by MDHHS.

First, the Agreement's centerpiece is its "service array": the Michigan Intensive Child and Adolescent Services (MICAS). *Id.* at PageID.1694–98. The Agreement's MICAS component requires MDHHS to expand and maintain six home- and community-based Medicaid services: (1) Intensive Crisis Stabilization; (2) Intensive Home-Based Services; (3) Intensive Care Coordination with Wraparound; (4) Respite Care; (5) Parent Support Partners; and (6) Youth Peer Support. *Id.* at PageID.1695–98. For each service, the MDHHS must set annual targets, monitor use, and revise regulations and contracts to guarantee availability statewide. *Id.*

Second, MDHHS must better inform class members, providers, and public child-serving agencies about what services exist and how to access them. *Id.* at PageID.1698–69. The Agreement requires MDHHS to develop communication tools that describe the MICAS array, explain grievance and appeal rights, and outline protections under Michigan's mental health code. *Id.* PageID.1698. It must also launch a public website and update beneficiary handbooks distributed by managed care entities. *Id.*

Third, under the Agreement, MDHHS must set statewide access standards, build capacity to serve eligible children, and use proxy data to project demand. *Id.* at PageID.1699–1700. Moreover, MDHHS must implement a standardized statewide assessment tool to assist in determining whether a child qualifies for MICAS and to operate as a decision support tool for providers to determine individualized services and intensity of care coordination. *Id.* And it must develop manuals, train and certify assessors, and adopt policies requiring the tool's use. *Id.*

Fourth, the Agreement addresses workforce development and training. *Id.* at PageID.1700–01. MDHHS must establish a capacity-building structure to build training and technical assistance programs, create a workforce development plan, and allow clinicians to work in teams with paraprofessionals. *Id.* It has already launched a dedicated division and a loan repayment program to attract providers, both of which are acknowledged as progress toward compliance. *Id.*

Fifth, the Agreement requires robust data collection. *Id.* at PageID.1701. To track Medicaid child behavioral health utilization and expenditure data, MDHHS has created a data monitoring unit. *Id.* The unit must measure the timeliness of access, denials of access, racial/ethnic and regional variation in indicators listed in the Agreement, and changes in living situation as stated in the Agreement. *Id.* at PageID.1701–02. It must then publish specific information in a public dashboard as required by the Agreement. *Id.*

Sixth, the Agreement addresses MDHHS's state oversight. *Id.* at PageID.1702. As a resource for managed care entities and children's behavioral health providers, MDHHS must maintain a clinical support team. *Id.* Further, MDHHS must update its statewide Comprehensive Quality Strategy, revise managed care contracts as necessary, and require regular reporting from managed care entities. *Id.* And MDHHS will also establish an advisory body, including providers and families with lived experience, to review performance data, advise on quality benchmarks for the MICAS array, and give feedback on the efforts under the Agreement. *Id.* at PageID.1702–03.

Seventh, the Agreement seeks to strengthen the process afforded to class members. *Id.* at PageID.1703. Indeed, the Agreement requires care entities to issue notices when they deny, reduce, suspend, or fail to timely provide relevant services. *Id.* The Agreement also provides substantial benefits regarding grievance and appeal systems. *Id.* at PageID.1703–04.

Eighth, and lastly, if the Settlement is approved, MDHHS must prepare an implementation plan within twelve months. *Id.* at PageID.1704. This plan must identify the tasks necessary to substantially comply with the Exit Criteria, establish reasonable timelines to substantially comply with the Exit Criteria, and assign responsibilities. *Id.* Subject to certain limitations identified in the Agreement, MDHHS may modify the plan as needed. *Id.* at PageID.1704–05.

***Contingencies.*** The Settlement contains contingencies. One such contingency is that the Agreement depends on funding and federal approvals. *Id.* at PageID.1714. Specifically, the MDHHS must seek sufficient appropriations from the legislature and any necessary approvals from the Centers for Medicare & Medicaid Services (CMS). *Id.* The services must also remain eligible for Medicaid coverage. *Id.* Importantly, Michigan's legislature has already appropriated millions of dollars to fund the Settlement's commitments. *See, e.g.*, MICHIGAN HOUSE FISCAL AGENCY, *Appropriations Summary and Analysis for Fiscal Year 2021–22* 99 (Nov. 2021) (noting $91,000,000 appropriation "for estimated children behavioral health service utilization increases to implement future policy changes related to" this lawsuit); *see also* MICHIGAN SENATE FISCAL AGENCY, *MDHHS Appropriation Line Item and Boilerplate History* 29 (Aug. 2024) (same).

***Attorneys' Fees, Releases of Claims, and Dispute Resolution.*** The Settlement provides for attorneys' fees. *Id.* at PageID.1720. Under the Agreement, subject to this Court's approval, the MDHHS will pay $3.5 million to Plaintiffs' Counsel for their work on this case through December 31, 2027. *Id.* After that date, Counsel may seek additional reasonable fees, either by negotiation or motion. *Id.* at PageID.1721–22. But the award resolves all prior claims for fees and costs. *Id.* at PageID.1720.

Further, the Agreement defines the scope of claim releases and how the Parties will handle disputes over the Settlement. *Id.* at PageID.1718–19. Up front, the Class releases all claims for

declaratory or injunctive relief related to Medicaid behavioral health services that were raised or could have been raised in the Amended Complaint. *Id.* at PageID.1719. The release does not affect an individual beneficiary's right to pursue administrative hearings or judicial review of Medicaid eligibility or service determinations. *Id.* at PageID.1719–20. Moreover, the Settlement establishes a structured dispute resolution process: the Parties must first confer in good faith, then submit unresolved disputes to mediation before seeking judicial relief. *Id.* at PageID.1716–17. But importantly, the Agreement does not create a breach-of-contract claim; compliance with it is enforced solely through its own procedures and this Court's retained jurisdiction. *Id.* at PageID.1716.

> ***Retained Jurisdiction and Monitoring.*** Finally, the Settlement includes a defined exit plan. *Id.* at PageID.1705. The parties expect full implementation of the Agreement by December 31, 2029. *Id.* Until then, the Parties request that this Court retain jurisdiction over the enforcement or modification of the Agreement as described in the Agreement. *Id.* at PageID.1693, 1714. And, if the MDHHS has substantially complied with the Exit Criteria, the Parties will stipulate or move to terminate this Court's retained jurisdiction. *Id.* at PageID.1705.

### 2. Motions Seeking Approval of the Class Settlement and Attorneys' Fees

On January 17, 2025, the Parties sought preliminary approval of their class settlement. ECF No. 108. On April 3, 2025, this Court preliminarily approved the settlement. ECF No. 114. As a result, notice to absent class members was directed, and a Civil Rule 23(e)(5) objection deadline was set for June 17, 2025. *Id.* at PageID.2169. After that, notice was distributed, and no one objected to the settlement. *See* ECF Nos. 119-2; 119 at PageID.2587.

On July 9, 2025, Plaintiffs moved for final approval of the settlement. ECF No. 119. And, consistent with the Settlement Agreement, Plaintiffs' Counsel seek $3.5 million in attorneys' fees for work on this case through December 31, 2027. ECF No. 111.

## II.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation modified). As a result, class litigation involves considerable judicial oversight. *See id.* And because class litigation "magnifies the stakes of litigation and can thus have massive ramifications for plaintiffs and defendants alike," courts must scrupulously discharge their oversight duties. *In re Ford Motor Co.*, 86 F.4th 723, 726 (6th Cir. 2023).

One such oversight duty stems from proposed class settlements. Indeed, Civil Rule 23(e) requires judicial approval of any settlement agreement that binds absent class members. FED. R. CIV. P. 23(e). To that end, a court must undertake a two-step approval process for proposed class settlements: preliminary approval and final approval. *See id.* At the preliminary-approval stage of a proposed class settlement, courts ask "simply whether the settlement is" likely "fair enough" to begin the class-notice process. *Garner Props. & Mgmt. v. City of Inkster*, 333 F.R.D. 614, 626 (E.D. Mich. 2020). But at final approval, courts must affirmatively find that the settlement satisfies Civil Rule 23(e)'s fairness, reasonableness, and adequacy criterion. FED. R. CIV. P. 23(e)(2). And where, as here, counsel moves for attorneys' fees, courts must also ensure that they are reasonable, and that counsel's motion complied with Civil Rule 23's procedural requirements. *See* FED. R. CIV. P. 23(h).

## III.

Based on the pending motions, as reflected below, this Court will undertake two analyses. It will first address the Motion for Final Approval of the Class Settlement. ECF No. 119. And because the Settlement will be approved, it will then address the Motion for Attorneys' Fees. ECF No. 111.

## A. Final Approval Motion

At the final approval stage, a court can only approve a settlement if it is fair, reasonable, and adequate. FED. R. CIV. P. 23(e)(2). To assess a settlement's fairness, reasonableness, and adequacy, a court must consult two sets of factors. First, a court must analyze factors from Civil Rule 23(e). Second, it must probe several factors outlined by the Sixth Circuit. *Int'l Union, UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007). While probing these factors, courts must respect that "[o]nce preliminary approval has been granted, a class action settlement is presumptively reasonable." *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 550 (S.D. Ohio 2000) (citing *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)). And courts must also remember that in class actions, the law favors settlements. *See, e.g.*, *UAW*, 497 F.3d at 632; *Griffin v. Flagstar Bancorp, Inc.*, 2013 WL 6511860, at *2 (E.D. Mich. Dec. 12, 2013); *In re Packaged Ice Antitrust Litig.*, 2011 WL 717519, at *7 (E.D. Mich. Feb. 22, 2011).

### 1. Rule 23(e) Factors

Start with the Civil Rule 23(e) factors. Four factors govern whether a settlement is "fair, reasonable, and adequate" under Civil Rule 23(e): whether (1) "the class representatives and class counsel have adequately represented the class"; (2) "the proposal was negotiated at arm's length"; (3) "the relief provided for the class is adequate"; and (4) "the proposal treats class members equitably relative to each other." All four factors favor approval of the Settlement Agreement.

***Adequate Representation.*** This Court has already found that Class Counsel is adequate under Civil Rule 23(a)(4) and (g). *D.D. by Next Friend B.N. v. Michigan Dep't of Health & Hum. Servs.*, 639 F. Supp. 3d 750, 757 (E.D. Mich. 2022). So the first factor supports approving the Settlement Agreement. *See* 4 *Newberg and Rubenstein on Class Actions* § 13:48 (6th ed. 2025)

(noting that the first Rule 23(e) factor is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively").

***Arm's Length Negotiation***. The Parties negotiated the Settlement Agreement at arm's length. After engaging in adversarial motions practice, the Parties undertook years of arm's-length, monthly negotiations to reach a final settlement. *See* ECF Nos. 108-6 at PageID.1746; 86; 87; 88; 90; 91; 92; 93; 94; 95; 96; 97; 99; 101; 102; 103; 105; 106. Thus, the second Civil Rule 23(e) factor favors approval.

***Adequate Relief.*** This factor requires courts to assess four subfactors: (1) "the costs, risks, and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims"; (3) "the terms of any proposed attorney's fee, including timing of payment"; and (4) "any agreement required to be identified under Rule 23(e)(3)." FED. R. CIV. P. 23(e)(2)(C). Considering these subfactors, the Settlement relief represents an adequate compromise.

First, the Settlement Agreement is identified, ECF No. 108-2, and there is no evidence of Civil Rule 23(e)(3) side agreements that could undermine the Agreement's adequacy. *See, e.g.*, *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, No. 16-CV-13777, 2024 WL 4361947, at *2 (E.D. Mich. Sept. 30, 2024); *Chavez v. Falcon Transp. Co.*, No. 4:19-CV-958, 2025 WL 959219, at *9 (N.D. Ohio Mar. 31, 2025); *Johnson v. Rausch, Sturm, Israel, Enerson, & Hornik, LLP*, 333 F.R.D. 314, 322 (S.D.N.Y. 2019).

Second, settlement allows Class Members to avoid the significant risks and uncertainties inherent in continued litigation. The Parties acknowledge that more litigation would be complex, uncertain, and costly. *See* ECF No. 108-2 at PageID.1689. For example, Defendants note that if this case proceeds, the Parties would need to engage in complex and costly expert discovery. ECF

No. 120 at PageID.2643. Moreover, Defendants reserved the right to move to decertify the Class should the Settlement fail. ECF No. 108-2 at PageID.1689. And continued litigation could feature motions for summary judgment, applying Medicaid law: an area of law one court described as "the regulatory equivalent of the Serbonian bog." *Cherry by Cherry v. Magnant*, 823 F. Supp. 1271, 1274 n. 4 (S.D. Ind. 1993). These hurdles could prolong an already protracted years-long case and cost considerable public and private resources. By contrast, the Settlement provides immediate relief—the very overhaul of MDHHS's home- and community-based services for Class Members that they sought at the outset of this case. *Compare* ECF No. 108-2 *with* ECF Nos. 1; 71.

Third, the proposed method of distributing relief supports the adequacy of the Settlement. The Settlement affords Class Members prompt, statewide injunctive relief. *See generally* ECF No. 108-2. This injunctive relief is effective in providing "benefits for all class members." *Ball v. Kasich*, No. 2:16-CV-282, 2020 WL 1969289, at *7 (S.D. Ohio Apr. 24, 2020) (finding, implicitly, that immediate injunctive relief is an effective distribution of relief).

Fourth, the attorneys' fees do not undermine the adequacy of relief. The attorneys' fees do not reduce the amount of relief provided to the Class Members. *See generally* ECF No. 108-2. Further, the Parties did not negotiate these fees until after they reached final settlement terms on the merits. ECF No. 108-7 at PageID.1768. And, as explained below, balanced against the substantial relief negotiated, these fees are reasonable given the length and complexity of this case, as well as the initial adversarial posture. *See* Section III, B; *see also Gascho v. Glob. Fitness Holdings*, LLC, 822 F.3d 269, 277–78 (6th Cir. 2016); *cf. In re Dry Max Pampers Litig.*, 724 F.3d 713, 718–19 (6th Cir. 2013).

In short, all four subfactors support final approval. Thus, the third Civil Rule 23(e) factor favors approving the Settlement Agreement.

*Equitable Treatment of Class Members.* Finally, Civil Rule 23(e)(2)(D) requires that a settlement treat class members equitably. The Settlement Agreement provides classwide relief using uniform injunctive remedies and MDHHS commitments. *See generally* ECF No. 108-2. Not to mention, this relief yields substantial enhancements to MDHHS home- and community-based services for the Class Members, conferring "life-changing benefits." ECF No. 119-3 at PageID.2625. And there are no service or incentive awards for named Plaintiffs that could undercut equitable treatment. *Moeller v. Wk. Publications, Inc.*, 646 F. Supp. 3d 923, 925–27 (E.D. Mich. 2022); *see also In re Dry Max Pampers Litig.*, 724 F.3d at 718. In other words, the Settlement does not give "preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *Vassalle v. Midland Funding LLC,* 708 F.3d 747, 755 (6th Cir. 2013) (internal quotation marks omitted). As a result, this fourth factor favors approval.

In sum, all four Civil Rule 23(e) factors support approving the Settlement Agreement.

## 2. Sixth Circuit Factors

Turn to the Sixth Circuit factors.[5] The Sixth Circuit has provided seven factors for courts to consider before approving a class settlement: (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *UAW*,

---

[5] The Federal Rules of Civil Procedure were amended in 2018 to include the four factors for approving settlement agreements. *See* FED. R. CIV. P. 23(e). Before this amendment, the Sixth Circuit developed the seven factors discussed here. *See UAW*, 497 F.3d at 631. But the advisory committee made clear that the 2018 amendment did not replace any such factors. *See* FED. R. CIV. P. 23 advisory committee's note to 2018 amendment ("The goal of this amendment is not to displace any factor [a circuit provided], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."). This Court must therefore analyze the Sixth Circuit factors.

497 F.3d at 631. Many of these overlap with the Rule 23(e) factors. And here, they compel approval of the Settlement Agreement.

*Risk of Fraud or Collusion.* Courts "presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary." *Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 838 (E.D. Mich. 2008) (citing *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006)). No evidence of fraud or collusion exists here. In addition to the presumption of no fraud or collusion, the Parties vigorously litigated the case with dispositive motions before transitioning to a settlement posture, which further indicates that the Settlement is not the product of malfeasance. *See In re AME Church Emp. Ret. Fund Litig.*, No. 1:22-MD-03035-STA-JAY, 2025 WL 2396514, at *4 (W.D. Tenn. Aug. 18, 2025). So the first Sixth Circuit factor encourages approval.

*The Complexity, Expense, and Likely Duration of the Litigation.* As explained for the Civil Rule 23(e)-adequacy factor, the Settlement Agreement represents an adequate compromise considering the complexity, expense, and duration of this case and the continued litigation of it. Accordingly, this factor favors approval. *Fox v. Cnty. of Saginaw*, No. 1:19-CV-11887, 2025 WL 2419232, at *15 (E.D. Mich. Aug. 21, 2025) (noting the overlap between this factor and the Civil Rule 23(e)-adequacy factor).

*The Amount of Discovery Engaged in By the Parties.* A settlement is "more likely to be fair and reasonable under the circumstances" if the parties have conducted discovery to assess the viability of the claims at trial. *Green v. Platinum Rests. Mid-Am. LLC*, No. 3:14-CV-439, 2022 WL 1240432, at *5 (W.D. Ky. Apr. 27, 2022) (citing *O'Bryant v. ABC Phones of N.C., Inc.*, No. 19-CV-02378-SHM-TMP, 2020 WL 7634780, at *14 (W.D. Tenn. Dec. 22, 2020)). Before and during this case, *see* ECF No. 119-3 at PageID.2620–24, the Parties conducted ample discovery

and informal discovery to "adequately assess their case and the desirability of the proposed settlement." *Kritzer v. Safelite Sols.*, LLC, 2012 WL 1945144, at *7 (S.D. Ohio May 30, 2012). Thus, this factor favors approval.

*Likelihood of Success on the Merits.* The likelihood of success on the merits is a critical factor. *Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886, 895 (6th Cir. 2019). In fact, according to the Sixth Circuit, this factor is the "most important of the factors." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 245 (6th Cir. 2011). If the plaintiffs have a strong likelihood of success on the merits, a settlement should reflect as much by providing greater relief than it would if the plaintiffs faced considerable risks on the merits. At the same time, courts must remember that "class action settlements involve a balancing of competing interests" and risks. *Does 1-2*, 925 F.3d at 895.

Here, if Plaintiffs' allegations are true, they would have a substantial likelihood of success on the merits. *See* ECF No. 29 at PageID.917–25. Accordingly, the Settlement should provide relatively significant relief. It does. As explained above, it provides the relief sought in the Original Complaint and Amended Complaint, *see generally* ECF Nos. 1; 71, and it meaningfully overhauls healthcare services for the Class Members, *see generally* ECF No. 108-2. This factor thus supports approval.

*The Opinions of Class Counsel and Class Representatives.* Class counsel's endorsement of the settlement is "entitled to significant weight" and "supports the fairness of the class settlement." *Moeller*, 649 F. Supp. 3d at 543 (citation modified). Here, Class Counsel—an experienced class action litigator—deems the Settlement fair, adequate, and reasonable, stating that in his view, it provides Plaintiffs "life-changing benefits" and "virtually all, if not all, of the relief sought in the complaint." ECF No. 119-3 at PageID.2625. This factor therefore favors

approval too. *See Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 296 (W.D. Ky. 2014) ("Giving substantial weight to the recommendations of experienced attorneys, who have engaged in arms-length settlement negotiations, is appropriate.") (quoting *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3341200, at *4 (W.D. Ky. Aug. 23, 2010)); *see also In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d. 336, 341 (E.D. Pa. 2007).

*The Reaction of Absent Class Members.* In class litigation, "[a] certain number of . . . objections are to be expected," but if "only a small number of objections are received, that fact can be viewed as indicative of the adequacy of settlement." *In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508, 527 (E.D. Mich. 2003). Here, there are no objections to the Settlement Agreement, which bolsters the Agreement's adequacy. *See In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2018 WL 7108016, at *6 (E.D. Mich. Nov. 6, 2018). As a result, this factor strongly supports final approval.

*The Public Interest.* Because class actions are complex and unpredictable, judicial-resource-saving class settlements are encouraged and in the public interest. *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. at 530 (citing *Granada Invs. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992)). Settling this class action would advance the public interest by providing swift relief to Class Members, preserving considerable resources in the process. And because this Court finds that the relief is adequate, it further finds that the Settlement Agreement advances the public interest. This final factor therefore supports approval.

At bottom, all seven Sixth Circuit factors militate in favor of approval. Thus, because all four Civil Rule 23(e) factors also favor approval, all eleven relevant factors support approving the Settlement Agreement. So this Court will do so and grant the Motion for Final Approval, ECF No. 119.

## B. Attorneys' Fees Motion

Shifting to attorneys' fees. Plaintiffs' Counsel seeks $3.5 million in attorneys' fees for almost a decade's worth of work—totaling 9,651 hours—at a 40% discount from the fees initially sought. *See* ECF Nos. 111; 116. This request is brought under the Parties' Agreement and fee-shifting provisions in 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a(b), and Civil Rules 23(h) and 54(d)(2). *See* ECF No. 111 at PageID.1987. Without conceding that Plaintiffs are prevailing parties, Defendants do not oppose this Motion. *See* ECF No. 113.

In class actions, courts "may award" attorneys' fees "and nontaxable costs that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). But before issuing such an award, the attorneys' fee request must satisfy certain procedural and substantive requirements. *See id.* Procedurally, a "claim for an award must be made by motion" and "[n]otice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner," giving the class members an opportunity to object to the award. FED. R. CIV. P. 23(h)(1)–(2). Substantively, the attorneys' fee request must be reasonable. FED. R. CIV. P. 23(h). In the end, Plaintiffs' Counsels' request fulfills both procedural and substantive requirements.

As for procedure, the attorneys' fee request complied with Civil Rule 23(h)(1)–(2)'s prerequisites. Indeed, Plaintiffs' Counsel filed an independent Motion and served it on all Parties. ECF No. 111. And although no Class Member objected, the Notice to the Class Members notified them about the $3.5 million attorneys' fee request, rendering the award procedurally sufficient. ECF No. 108-4 at PageID.1736 ("The Agreement requires Defendants to pay $3,500,000.00 (Three Million and Five Hundred Thousand Dollars) to Plaintiffs' counsel for any attorney fees and costs incurred through December 31, 2027. No Class Members have paid any fees or litigation

costs, nor will they be required to do so."); *see also* ECF Nos. 119-2 at PageID.2601–02 (declaring that this particular notice was distributed to the class).

As for substance, the attorneys' fee award is reasonable. When awarding attorneys' fees "in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v. Prudential–Bache Properties, Inc.,* 9 F.3d 513, 516 (6th Cir. 1993). In so doing, courts often employ the "lodestar method" for calculating reasonable attorneys' fees.[6] *See Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016). The lodestar method is straightforward: To determine the lodestar figure, courts multiply the number of hours "reasonably expended" on the litigation by a "reasonable hourly rate." *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995). After that, courts "may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Adcock–Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).

Start with Plaintiffs' Counsels' hours worked: 9,651. The party seeking attorneys' fees must provide the court with enough information to ensure that the hours claimed were both real and reasonable. *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (quoting *United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Loc. 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984)). Plaintiffs' Counsel has done

---

[6] At times, courts must choose between the lodestar method and the "percentage-of-fund" method of assessing the reasonableness of attorneys' fees. *Gascho*, 822 F.3d at 279. The percentage-of-fund method requires courts to "calculate the ratio between attorney's fees and benefit to the class." *Id.* at 282. But because the benefit to the class here is injunctive and not monetary relief, the lodestar method is better suited to analyze Plaintiffs' Counsel's request. Further, Class Counsel devoted substantial resources in this action, "despite the risk of not being compensated," and "limiting an award to a percentage of the actual recovery could dissuade counsel from undertaking similar" class actions "in the future." *Id.* at 280.

that here, supplying declarations and detailed billing records that support the reasonableness of the 9,651-hour figure. *See* ECF Nos. 108-7; 116-2–11.

Turn to the Plaintiffs' Counsels' hourly rates. Plaintiffs' Counsel's hourly rates among the 18 attorneys range from $795 an hour for equity partners and senior litigators to $225 an hour for junior attorneys. *See* ECF No. 111 at PageID.2003–04. Analyzed against prevailing market rates, these rates are well within the range of reasonableness. *See* ECF No. 111-3 at PageID.2080 (noting that in 2022, the average billing rate for equity partners was $876); 111-4 at PageID.2149 (noting that in 2020, for class action litigators representing plaintiffs, the average billing rate for senior partners ranged from $801–901, $701–800 for partners, $501–600 for junior partners, $401–500 for senior associates, and $201–300 for associates and junior associates); 111-5 at PageID.2156 (noting that these rates were even higher as of 2024); *accord* STATE BAR OF MICHIGAN, *2023 Economics of Law Report* (last visited Aug. 24, 2025), https://www.michbar.org/file/pmrc/pdfs/E oL_Report23.pdf [https://perma.cc/AK9F-3SLR] (reflecting similar rates in 2022, which have surely increased since then based on comparable market analyses).

Based on the billing records and rates that Plaintiffs' Counsel supplied, a $3,500,000 award is reasonable. The lodestar is not easy to pin down here. Counsel applied a discount, and part of the request covers costs and work not yet performed. *See* ECF Nos. 111; 116. Still, even a rough calculation—multiplying the average rate of the 18 attorneys, $517, by the 9,651 hours worked—yields $4,989,567. And that figure likely understates the true lodestar. The billing records show that senior lawyers, billing at rates above the average, carried much of the workload, given the stakes of the case. *See, e.g.*, ECF No. 116-2. Taking all this together, this Court is satisfied that $3,500,000 is a reasonable award, reflecting both the significant benefits secured for the class and the substantial resources expended to resolve a complex dispute at fair rates.

In sum, both the Settlement Agreement and Attorneys' Fees request pass muster. So the Motion for Final Approval of the Settlement Agreement, ECF No. 119, and Motion for Attorneys' Fees, ECF No. 111, will be granted.

**IV.**

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Final Approval, ECF No. 119, is **GRANTED**.

Further, it is **ORDERED** that Plaintiffs' Counsel's Motion for Attorneys' Fees, ECF No. 111, is **GRANTED**.

Further, it is **ORDERED** that Plaintiffs' Counsel is **AWARDED** $3.5 million in attorneys' fees, paid according to the Parties' Settlement Agreement, ECF No. 108-2 at PageID.1720–22.

Further, it is **ORDERED** that this case is **DISMISSED**, and this Court **RETAINS JURISDICTION to enforce or modify the Agreement,** until further order of this Court. *See RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 641 (6th Cir. 2001) (*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994))

**This is a final order and closes this case.**

Dated: August 28, 2025                                  s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge